[Decided February 2, 1888.]

## GEORGE H. MILLER *v.* TERRITORY OF WASHINGTON.

1. HOMICIDE—MURDER — CIRCUMSTANTIAL EVIDENCE — SUFFICIENCY. — On a trial for murder, the evidence, chiefly circumstantial, showed that the two victims, being on their way to Seattle in a boat, in the early morning, were shot, and their bodies sunk in the lake; that one of the bodies was robbed; that gunshots were heard from that direction about seven A.M.; that their boat was found beached at a point three miles distant. It appeared that defendant left his home at eight o'clock that morning, and arrived in Seattle shortly after ten A.M.; that it was hardly possible for him to have committed the crime and have arrived in Seattle before one o'clock; that he had a black boat, and that some person was seen from a distance in a black or dark boat, on that morning, going from where the bodies were found towards defendant's house. It also appeared

that he owned a Winchester rifle, with which the shooting might have been done. None of the stolen property was traced to defendant's possession. The only evidence as to motives was that one of the victims and defendant had been subpœnaed to testify before the grand jury, in Seattle, that morning, presumably concerning a charge against defendant's son, about which defendant showed great anxiety. No threats were shown. Defendant, an ignorant, illiterate man, when arrested, displayed some agitation. He was more agitated when taken by the sheriff, who maintained towards him a hostile and threatening attitude, to the scene of the murder. When taken into the presence of the dead bodies at the undertaker's, and asked by the sheriff: "How do you feel in the presence of the evidence of your hellish crime?" he looked away, and "breathed hard:" *Held*, the evidence was insufficient to support a verdict of guilty.

2. SAME—INSTRUCTIONS, EVIDENCE TO SUPPORT.—To instruct that, though defendant may not have been present, yet if he advised, aided, or abetted the commission of the crime, he is guilty, where there is no evidence of any such advice or acts, is error.

ERROR to the District Court holding terms at Seattle. Third District.

The defendant in the court below was convicted of murder in the first degree, and sentenced to death, from which judgment he appealed. All the necessary facts appear in the opinion of the court. No authorities were cited in the briefs of counsel on the point decided by the court, that the verdict was insufficient under the evidence brought up by the record to allow the verdict of guilty to stand.

*Mr. J. B. Metcalfe,* and *Mr. Junius Rochester,* for the Plaintiff in Error.

*Mr. J. T. Ronald, Prosecuting Attorney,* for the Defendant in Error.

Mr. Justice LANGFORD delivered the opinion of the court.

This is a case wherein plaintiff in error as defendant, upon the verdict of the jury, was adjudged guilty of murder in the first degree, and sentenced to be hanged. One of the errors is claimed to be that the court erred in overruling the motion for a new trial. Among the errors assigned is that the court erred in not sustaining the defendant's motion for a new trial, and a certain erroneous instruction.

The *corpus delicti* is well proven; the only question to be considered, as to the ruling upon motion for new trial, is whether the evidence shows that Miller committed the crime. The murder was the shooting of one George M. Colman and a sixteen-year-old school-boy by the name of Patten. The last time these two persons were seen alive was when they started from Colman's house, about half-past six o'clock upon Monday morning, the 8th day of February, 1886.

They started in a boat—Colman rowing on the front seat and Patten on the back seat—on a trip to Seattle. Their course lay westerly around the head of Mercer's Island and thence along the western shore thereof.

Not having been heard from, search was made, and upon the 12th—four days after they were missed—their boat was found, pulled upon the beach, filled with water and with rocks in the back part of the boat, with Colman's coat in the boat, as well as his false teeth, and with a mismatched pair of oars near by.

The point where the boat was found was about five miles from Colman's, and near the house of Bogart and Proctor; about three hundred yards north of Bogart's house. To get to where it was the boat had to pass the house of Bogart, which, at the time, was unoccupied. About a mile off, west of where its route would be, across the lake, were the houses of Matheson and Wilson, in as plain sight and hearing as a mile of intervening water would allow.

After finding the boat, as above mentioned, the search for the bodies was continued, and at a point about three miles south of where the boat was found the bodies were discovered. At this last point the bodies were found in the lake near the island, in about fifteen feet of water, and two coats of Patten, and other things, were found there.

Near this place were found the other two oars that belonged to the Colman boat, mismatched, as were those that were found near the boat. The body of Colman had been robbed of money and a gold watch, but Patten's body had not been robbed.

Each body had two gunshot wounds. One wound in each of them would have been immediately mortal. The mortal wound received by Colman was in the left temple; that of Patten in the left side. These wounds could have been inflicted by shots from the island opposite. to where the bodies were found; and if inflicted while the deceased were rowing on their course, the shots must have been fired from the island or from that direction. If the bodies fell instantly after these shots, as they must have done, then, after they fell, each was again shot. Colman was the second time, after he fell, shot in the top of the head, a little on the right side, the ball running down.

If the boat had continued its course, this shot must have come from a boat farther from the shore than Colman's and from off the bow of Colman's boat, presuming that Colman fell the natural way, which would be opposite from the blow of the first shot, or directly backwards. If, after the first shot, the boat had turned directly around, the second shot might have come from the island. If the shots were fired by the same person, some time must have intervened between the first and second shots; if the first shot came from shore and the second shot from a boat farther from the shore than Colman's, the shots may have been near together.

The second shot which was received by Patten was in the back part of the right thigh, ranging upwards and forwards. The shot which made the wound must have been fired from a boat at the stern of the Colman boat, after Patten had fallen backwards.

The two first shots that killed both may have been fired simultaneously, and the last two, a few moments afterwards, may have been fired simultaneously, but the four shots could not have been fired simultaneously. If both sets of shots had been fired by the same person, there must have been sufficient time between them for a man, after he shot from shore, to have gotten into his boat and gone out to the opposite side of Colman's boat to deliver the second shots.

The murder must have been committed by some person or persons having a boat, which, after the first shots, took such person or persons to Colman's boat; or the murder must have been committed by at least one on shore and the other in a boat.

After the last shots were fired, the murderers must have gotten into Colman's boat, and he or they must have thrown the bodies overboard in haste, leaving Colman's overcoat in the boat, and throwing Patten's coat overboard.

There must have been two oars there thrown overboard, and two remained, and as the oars left in the boat and the two thrown overboard were mismated, there was great haste.

If there had been but one man concerned in the murder, then he must have fired two shots and killed both of the deceased, then entered his boat and gone around Colman's boat and delivered the two shots, jumped from his own boat into Colman's and thrown out the bodies, then hitched the boats together and rowed one and towed the other the three miles past Bogart's house, then left the Colman boat, throwing the oars thereof ashore, and then he must have gotten into his own boat and rowed away. A good rower can row the three miles in forty-four minutes, if he has nothing to tow; with another boat in tow it could not be made in less than an hour. And add to this the time spent in robbing the body of Colman and throwing the bodies overboard, it would take probably an hour and a half to do the whole thing, and at the time Colman's boat was landed it would be at least half-past eight o'clock.

To obtain light upon this dark subject it would have been natural, when the Colman boat was first discovered, to have made inquries at Proctor's, near which the boat was discovered; but there is no evidence that such inquiry was thus made.

When the bodies were found it would have been natural to inquire at Matheson's and Wilson's houses, which were across the lake, a mile from the place of the murder. This was done.

Mrs. Matheson testifies that "she saw, on Monday morning, the 8th, at about seven o'clock, coming around the point of the island opposite her place, a white boat, as it looked. Shortly afterwards, she heard shots towards or on the island; were three or four of them, she thinks four shots, which came from the island or point. Quite a little while after the shots it, the boat, came right around, but not in the direct route to Seattle; it looked like the boat was coming direct to our place, and was half-way over."

This Matheson place is about a mile from the island, and if this white boat was Colman's it went west one-half mile, then back the half mile, and thence three miles to where it was found.

Witness continues: "The shots were at seven o'clock or a little after. Saw but one boat." If this is true, then after the killing the murderers left their own boat and got into Colman's, or one boat was towed.

Witness continues: "It is about two miles from our house to the island." If this is true, the white boat, being Colman's boat, went five miles after the murder.

Witness continues: "I saw the boat three times; the second time about ten minutes after the first. When coming toward our place it looked black. Five or ten minutes after the second time, saw it the third time. When it turned back towards the island it looked white. There were no intervals between the shots; they followed so quickly that you could not distinguish the intervals between them." If these were the four shots that went into the bodies of the deceased, they could not have all been fired from the shore, for the situation of the wounds disprove this, but must have been fired from different sides of Colman's boat.

This is all the direct evidence of the facts of the shooting and of the persons who committed the crime, and this witness could not identify the persons, nor the number thereof, because of her distance from the scene.

Proctor, who lived a few hundred yards from where the boat was found, testifies he left home about seven o'clock that morning.

Neither Proctor nor wife saw anything of the transaction Monday morning.

Two days before the murder, the defendant, Colman, and several persons were supposed to go to Seattle and be before the grand jury there, on the morning of the murder, at ten o'clock. It is not exactly proven, but it may be inferred, that each party subpœnaed knew that the others were, and that each would start along the lake on the route to Seattle in time to reach there at ten o'clock; but this is not introduced to show that Colman was waylaid, but only to show what the animus of defendant was against Colman, deceased.

Next it is attempted to establish that the day before the killing defendant was on the waters of the lake near where the killing was done. What could have been the object of defendant's being there does not appear, as he would have had no occasion to have familiarized himself with the locality, for he was well acquainted with that without inspection. The witnesses who testify directly that they saw defendant in his boat, in the vicinity of the crime, also testify that he was on his way to his own home.

Had this all been true, it would tend to show that defendant was home Sunday night, and therefore was not lying in wait Monday morning. The witnesses who testify that defendant was there that Sunday are all Indians except young Colman.

Others testify that they saw some man in some dark boat, and that is all. Now, it is proven by two witnesses of the prosecution, corroborated by defendant's witnesses, that defendant was not in the vicinity that Sunday, but was elsewhere at a distant place. So, if any one with a black boat was in the vicinity, it was not defendant. This evidence tends to prove nothing against defendant; its only tendency is to prove that for some motive the Indians were testifying falsely. The testimony of the others, that they saw a man in a black boat Sunday, would tend to prove that there was some other man than defendant in that boat.

The next attempt is to prove that defendant was seen

coming from the vicinity of the murder soon after it was committed, Monday. The most that can be said of this is, that a man or woman was seen, but not identified, running north on the other side of the island. This is not different in definiteness from the evidence of having seen a man in a black boat Sunday, which was proven not to have been defendant.

If we consider that, if defendant had been at the place of the murder, had been in the boat which Matheson saw, to have gone where the black boat was seen going Monday, he must have traveled in his boat from the scene of the murder towards the Matheson place, one-half mile or more, and then back to where Colman's boat was found, three miles north of the murder, where he landed Colman's boat; he must have towed the boat to its landing; must have taken time to have committed robbery upon the body of Colman of his cash and his watch. Is it possible that all this could have taken less than between an hour and an hour and a-half? Then, starting southerly from the Colman boat, he would have to travel about eight and one-half miles to get home, which would have taken not less than two and a-half or three hours; so he could not have gotten home before eleven o'clock; then seven miles to Seattle, and he could not get to Seattle before about one o'clock. Defendant was at Seattle a little past ten o'clock, and no witness puts it so late as one o'clock.

Had he started from the Colman boat north around the island, and thus gone home, he could have reached there in an hour, or at half-past nine. On this route he would have met boats of the witnesses subpœnaed before the grand jury. He was seen by one of them coming from his home. By this course he could have gotten to Seattle at eleven o'clock. But there is no evidence that any person or boat was seen going that way that morning. There could have been no motive for his going that way.

The prosecution claimed that defendant, to have been present at the murder, must have gone north to his home, thence to Seattle, which we have seen was impossible, or he

must have crossed the island on foot. We have seen that the circumstances of the murder prove that the murderer had a·boat. The prosecution has proven by Mrs. Matheson that he had a boat. It was impossible that defendant could carry this boat across the island, yet he was seen coming from home in it that morning, on his way to Seattle, by a witness for the prosecution. The prosecution claim as the only possibility of defendant being at the scene of the murder, that after it was committed defendant went north around the island to Seattle, which would be nearly twenty miles, which, as we have seen, was impossible for him to do, and be in Seattle in the time all the witnesses testify, or that he crossed the island with his boat, in which he had captured the Colman boat. It was impossible for the defendant to have been at the scene of the murder, upon the testimony of the prosecution. The only discrepancy between the witnesses of the prosecution and the witnesses of the defendant, as to the whereabouts of defendant on Monday morning, is a variance in time of about an hour. Excluding the testimony of the Miller family, and we have two seemingly "credible witnesses" who testify that defendant left home for Seattle at a little after eight o'clock that morning. The prosecutor's witness puts it at about nine o'clock, or a little after. The preponderance of evidence upon this point is in favor of defendant, counting the testimony of the Miller family for naught. But if the prosecutor's witnesses are correct as to the time, still defendant could not have been present at the murder. But the possibility of defendant's having been present, with no evidence that he actually was present, would prove nothing as to the defendant's guilt.

It would have been possible for a great many other men to have been there as well. Not any of the articles of which the body of Colman was robbed have been traced to defendant; no property defendant ever owned was found near the place of the murder; no marks of the affray, such as blood stains or the like, were found upon him; no bloody clothes have been traced to him; no footprints that might

have been his have been found near the spot. The evidence strongly indicates that the murder was committed by more than one man, yet there is no evidence to indicate that defendant was one of them. The theory is that the defendant murdered Colman for vengeance alone. No white man murders for vengeance, and, at the same time, robs his victim. When a murder is for vengeance, the man scorns to rob, yet the deceased Colman was robbed. There are many savages who kill for revenge, and then rob their victims, for they deem such an act as an act of war, and robbery as trophies of war. That the defendant had any malice against either of the dead men, there is no evidence. He said he had bad neighbors, but did not name whom, nor threaten any. His conduct was rather that of sorrow than anger. He no doubt knew that two days before the murder some one had made a complaint before the grand jury against one of his boys. He knew that he and several others had been subpœnaed to be before the grand jury on this Monday at ten o'clock.

There is no evidence that he blamed Colman for this, any more than he did many other parties; or that Colman was a material witness against the boy. Indeed, if he was aware that Colman had been subpœnaed, as is probable, his inference ought to have been that some one other than the witnesses subpœnaed had made the complaint. This complaint against the boy weighed heavily upon him. He knew that a subpœna was out for the boy, and was frank enough to tell some of his neighbors that he did not think it best for his son to go before the grand jury. The boy hastily left, with no money and no weapons, for Newcastle, on Sunday night. This probably was to avoid the subpœna.

The conversation of defendant on the Monday of the murder, at Seattle, his subsequent conversation upon the time of his arrest, all show his anxiety about the charge against his son. These conversations were mostly with grand jurors; and clearly were, in a cautious but clumsy way, to discover what the accusations against the son were. His approaches were also attempts to pacify the grand jurors as

to this charge. He suspected that the accusation pertained to the age of his son; and he told these grand jurors about his son's age; and spoke of himself having been friendly to the jurors to whom he spoke. This anxiety about his son explains all his so-called suspicious conduct.

Defendant had a Winchester rifle, which was capable of inflicting the wounds upon Colman. So had many white men in the neighborhood; and at least one Indian, as the testimony shows, who was in the immediate vicinity. It is said that the attempted concealment of this rifle is a strong circumstance against the defendant. Had he attempted to conceal this rifle before others had suspected him of the murder, it would have been the only circumstance in the case which would have led to suspicion. Such an attempt would have tended to show both stupidity and guilty knowledge. But, instead of attempting to conceal the rifle immediately after the murder, he kept it in plain sight. It was, after the murder, seen in his kitchen and other places. After his first arrest and imprisonment, and while he was imprisoned, the gun was seen and afterwards concealed. The evidence tends to show that he has openly exhibited the gun after the murder, as he did continuously before, until after he was accused and arrested for the crime. His son testifies to seeing it in the room where it was usually kept after defendant's first imprisonment for the crime. The gun being left with defendant's wife and daughter, they probably, in their ignorant zeal, destroyed or concealed it and afterwards denied knowledge of it. This conduct upon their part was as consistent with their belief in defendant's innocence as in his guilt, for no doubt they would do anything they could to shield the husband and father from suspicion or relieve him from it.

The conduct of defendant, at the time of his first arrest, was not suspicious. As claimed by the prosecution, a friend, some time before the arrest, informed him that the sheriff was coming to arrest him for the murder. Defendant did not attempt to flee or hide himself, but dressed himself and waited for the sheriff to arrest him. The denial that he knew that the sheriff was coming to arrest him, and his afterwards

confessing it, is consistent with the wish, on defendant's part, to conceal his source of information—to protect the friend that had given him the information. It shows that defendant had little faculty for concealment. To have told the truth about this would have been a full explanation of why he was dressed, with his overcoat on, ready to be arrested. His asking what Colman he was accused of murdering, when told he was arrested for killing Colman, might be evidence that defendant was determined to conceal what knowledge he had from his accusers, had he have known. Doing this, after accusation of such a crime, is very common with innocent and ignorant persons. The circumstance that defendant, when taken the second time, after the bodies were discovered, and with numbers of men put upon a steamboat which first went past and then returned to the place where the bodies were found, is claimed to tell against the defendant's innocence. The accusation is that defendant, while seated beside the sheriff, looked steadfastly in an opposite direction from the place where the bodies had been found. The direction whence the bodies were found might have been communicated to defendant before the arrest, although he were innocent. He might not have known the place, and yet have looked in the opposite direction by mere chance. The sheriff may have sat in that direction, and defendant merely diverted his head from the sheriff. The former arrest and treatment of the defendant by the sheriff must have convinced the defendant that the sheriff thought him guilty, and was seeking to make the defendant criminate himself. The sheriff, when he first arrested him before, had grossly accused defendant of the murder. Was it any wonder then that he looked away from the sheriff?

The steamer went past the place where the bodies were found, then came back and landed. On this boat were the sheriff and a number of men whom, from their former conduct, defendant must have looked upon as his enemies. He knew they all accused him of the awful crime. He must have known of the lynching of men at Seattle, near by. When the steamer changed her course and turned around

and landed, it is not wonderful that defendant sprang to his feet and trembled, though innocent. When the sheriff, immediately after the landing, said to the prisoner in his custody: "Oh, you cowardly murderer, I would rather be in J. M. Colman's place at this moment than in yours," is there any wonder that the prisoner, though innocent, would tremble with horror and fear?

The sheriff took the prisoner from his cell, without notice of where he was taking him, into the presence of the dead bodies lying in their coffins. The sheriff walked backwards, keeping the prisoner's attention until he got to the coffin in which Patten was lying, when suddenly the sheriff said to the prisoner: " Look there!" The prisoner looked at the coffin a moment, and then averted his eyes and refused to look again. Next the sheriff tried to get the prisoner to look at the body of Colman, but he would not look. Then the sheriff said to the prisoner: "I want you to look in there and see the effect of your vengeance. How do you feel in standing in the presence of the evidence of your hellish crime?" The prisoner said nothing to this, but breathed hard. That a prisoner, thus treated, should breathe hard is not at all wonderful, and an innocent man would breathe as hard as a guilty one under such treatment. This, indeed, was putting the prisoner upon the rack. The former indignation of the prisoner at this sheriff, his direction to his wife to not talk or come near him, is entirely natural and consistent with the conduct of an innocent man thus treated and beset by the sheriff in whose custody he is.

From the manner in which the wife, daughter, and younger son of defendant testified, their evidence could have little or no weight; but the elder son testified freely enough, except that he attempted to conceal the fact that he was fleeing from the subpœna.

We can see nothing in the evidence to discredit Thomas Evans, Mr. or Mrs. Powell, or Conway, witnesses for the defendant, and they corroborate each other. If the testimony of these witnesses is not willfully false, defendant

could not have been present at the murder. Conway and
Evans each swear that defendant was at his home at eight
o'clock upon the morning of the murder, and for some time
before that. If defendant was at home then, it is impossi-
ble that he could have been present at the murder, nearly
four miles and a-half off. From the consciousness of this
fact, the prosecution, no doubt, after the court had deliv-
ered a copious and able charge, requested the court to
instruct, and the court did instruct, the jury as follows:

"It is not necessary in this case that you should find that
the defendant actually fired the fatal shots. If the evidence
satisfies you beyond a reasonable doubt that the defendant
caused or procured it to be done, or advised, aided, or abet-
ted the doing of it, he is equally guilty as if he had fired the
gun with his own hand."

There is not the slightest evidence that the defendant
advised any one to do the shooting, and in the state in
which the evidence was, the jury must have understood
that, although defendant was not himself present at the
murder, the jury might find the prisoner guilty. It implies
that there was evidence that might support a conviction,
although it had been satisfactorily proven that defendant
was at home when the murder was committed. This, we
think, was error. We can conceive of no way in which
defendant was suspected of this dark and bloody crime,
except upon the system of excluding all other persons as
being implicated in it, or who possibly could have been,
and then presuming therefrom that defendant was guilty.
Every man, whether innocent or guilty, was interested in
proving that he was not and could not have been the guilty
party himself. The detective then pounced upon defend-
ant, and the evidence is all directed to the fact that defend-
ant might have been present, not that he was actually pres-
ent. The prosecution was all directed to prove that defend-
ant might have been present; the defense, to prove that it
was impossible that he could have been. The whole trial
was seemingly directed to the possibility of defendant being
present at the murder, instead of the fact that he was there

actually.   This issue of possible guilt was all that the jury could have found, and to find even this was against the evidence.   The said instruction, assuming that even if defendant was not present at the murder, yet he might be convicted because he might have advised some one to commit the deed, though there is no evidence of any such advice, was wrong.   The system of fixing a suspicion of crime upon a man, because it cannot be conceived who else committed it, is dangerous.   To do this, a close scrutiny of each person who might have done the deed should be made.   If this is not done, and an accusation is made before it is done, then the innocent and guilty combine against the man accused; the guilty, most eager for conviction, mislead the innocent.   Even the innocent are interested in averting suspicion from themselves.   In this way an innocent man may fall the victim of the popular clamor of his neighbors.   If this hasty clamor is assisted by the press, the danger is greater.

This was the third trial of the accused.   The first was had at Port Townsend, where the prejudice was less, and eleven jurors were for acquittal, and probably the other would have agreed had not the jury been discharged against the consent of the defendant.

At the next trial the jury disagreed.

At the third trial, which was this, and upon insufficient evidence, the prisoner was found guilty.   The presumption, hastily indulged in, that defendant was guilty, prevented investigation as to the guilt of others.   The fruit of the robbery has not been found, nor has the probability that some one else has done the deed been investigated with that scrutiny with which it ought to have been.

The indication of guilt in others has been fading.

In the meantime, the certainty that the horrible crime had been committed by some one, and the suspicion being upon defendant alone, has caused each man to exaggerate every innocent circumstance into proof of defendant's guilt.   This bias is discernible in the prosecution, in the sheriff, and in almost every witness, from the testimony in the case.

The prosecution conducted the prosecution upon the theory, or rather upon several inconsistent theories, showing plainly that they relied upon no set of consistent evidence pointing to defendant's guilt. In fact, no such theory can be formed from the testimony. No cluster nor chain of circumstances point to defendant's guilt. The verdict must have been rendered upon suspicion and passion merely, and not from a deliberate weighing of the testimony in the scales of reason.

It is entirely insufficient to justify the verdict of guilty, and should have been set aside and a new trial granted.

The court erred in not granting this motion, and in entering judgment upon it. If there is no better or further evidence for the prosecution, the cause ought to be dismissed.

The judgment is reversed and set aside, and the case remanded to the District Court for further proceedings.

ALLYN, J., concurred.

Mr. Justice TURNER concurred specially, as follows:

I agree with all that is said by Mr. Justice Langford in his admirable opinion, but on account of the gravity of the case, and of the ground upon which we have concluded that the judgment must be reversed, I deem it proper to present the case briefly from another point of view.

My associate has made an analysis of all the testimony, and has very justly reached the conclusion that a preponderance of the evidence upon all the vital points of the case was with the defendant. I propose to review the testimony offered by the territory, and to consider if it is such as could justify a verdict of conviction, standing alone.

This is a case purely of circumstantial evidence. The testimony offered by the territory may be classified under the following heads: 1. Motive. 2. Inculpatory declarations prior to the act. 3. Antecedent preparations. 4. Facts tending to connect defendant directly with the murder. 5. Conduct of defendant when arrested for the crime, indicating guilty knowledge. 6. Destruction of inculpatory evidence.

1. What evidence of motive to murder Colman and Patten on the part of the defendant did the territory produce?

Mrs. Colman, wife of the deceased, was asked concerning ill feeling between her husband and the defendant, and testified that some ten or twelve years ago she and the defendant had had a misunderstanding about a boat, during which she accused the defendant of stealing and he accused her of stealing. The court promptly and properly ruled this out, and no further attempt was made by the territory in that direction.

It appears from the testimony of Deputy United States Marshal Henry that on the Saturday preceding the Monday of the murder, he subpoenaed the defendant Miller to appear before the grand jury at Seattle, at ten o'clock A.M. on the following Monday.

Henry disclosed to Miller that he had a subpoena for his, Miller's, son. This son was not at home, and Henry asked Miller to have him at Seattle on the following Monday. Henry then inquired of Miller the way to Colman's house, and took his leave.

It is gathered, inferentially, from statements made by Miller to some of his neighbors, that he apprehended an effort to have one of his sons indicted by the grand jury, and that he thought some of his neighbors were intermeddling with the matter; but what the nature of the crime was which it was attempted to fasten on his son, and who the person or persons were that were trying to fasten the crime upon him, is nowhere disclosed in the testimony.

The inference drawn by the territory evidently was that as Henry had subpoenaed Colman, Colman was a witness against Miller's son, and that as Henry had inquired Colman's whereabouts, when he left Miller on Saturday, that Miller knew Colman was a witness against his son. This was a matter, however, which ought not to have been permitted to rest on inferences. It was in the power of the territory to show exactly what Colman was subpoenaed for.

But if the inference be accepted as valid, how inadequate the motive that it shows for the awful crime which it has

attempted to fasten upon the defendant. Nothing in the case indicates that Colman was a willing witness; that he had urged on the prosecution of the defendant's son. The conclusion is sought to be drawn from the simple fact that Miller's son was being investigated by the grand jury for some crime not known, and from the fact that Colman was subpœnaed to testify before the grand jury about the matter, that the defendant had an adequate motive, not only for the waylaying and murdering of Colman, but for the murder also of Wilbur Patten, a school-boy, not connected in any way with Colman's family, and who happened by mere accident to be in the boat with Colman at the time and place of the murder. The history of crime discloses that the hand of vengeance, even in the most depraved, is stayed when its fall involves injury to the innocent; yet this farmer, who had spent the better part of his life upon Lake Washington, and who had raised a family of children, surrounding him at the time of the murder, in various stages of growth, was so inflamed against J. M. Colman by a trivial circumstance that he not only formed the design of murdering Colman, but when he discovered that he could not execute his design in safety without also murdering an innocent school-boy, he accepted the latter alternative and committed a most dastardly and brutal double murder. Many murders have been committed from what appeared to be inadequate motives, but I think the law reports will be searched in vain for the history of a case where so inadequate a motive was accepted as the moving cause of so brutal a crime.

2. Inculpatory declarations prior to the act.

These consist entirely of statements made to Mr. and Mrs. Knight by the defendant, on Sunday, the day prior to the day of murder. The defendant spent most of Sunday at the home of these witnesses, and took dinner with them and with a married daughter of theirs. Mr. Knight and his wife both testified that the defendant mentioned the fact that he and his son had been subpœnaed before the grand jury at Seattle the next day; that he thought it best his son

should not be there; that his son had taken up land and they were trying to make themselves homes, and would succeed if they were let alone, but that he had bad neighbors who were giving them trouble. These witnesses testified that the defendant showed emotion when talking about the matter, and that he turned away his face as if in tears. Possibly similar declarations were made by the accused to others.

These declarations show that the defendant was concerned about the attempt to indict his son, and that he was of opinion that some of his neighbors were active in their efforts in that direction; but they do not convey the idea, nor the germ of an idea, that he was harboring the thought of injury to any one.

Does the man who has made up his mind to murder his neighbor in cold blood dissolve in tears when talking about his supposed wrongs?

3. Antecedent preparations.

The territory proved, by a number of witnesses, that on Sunday evening, at a time placed by some of the witnesses at three o'clock and by others at a later period, a person in a black or dark boat was seen rowing on Lake Washington, southerly around Mercer's Island, the course being close in toward the shore of the island, and directly opposite the point where the murderer or murderers were probably concealed when the shots were fired which killed Colman and Patten. Two witnesses testified that this person was Miller. One was an Indian named Little Jack, who had never seen Miller before, and who denied on the trial that he and other Indians were on Mercer's Island on the Monday morning of the murder, but who had admitted to two reputable white persons out of court, several months before, that such was the fact. The other witness was George Colman, a young boy and son of the murdered man. He testified that he positively recognized Miller as the person in a black boat met by him rowing around the south end of Mercer's Island Sunday evening. The time he does not accurately fix. He admitted, on cross-examination, that on former trials he had merely testified that the person looked like Miller.

Could this person have been Miller? Mr. and Mrs. Knight, witnesses for the territory, testify that Miller left their house, after eating dinner, at three o'clock.

Three of the witnesses for the territory testify to seeing this black boat on the other side of Mercer's Island, ten miles from Knight's, as early as three o'clock. True, Little Jack and George Colman cannot fix the time that they saw Miller in his black boat Sunday evening; but the black boat which they claim to have seen was the black boat which the others saw, and the time that Little Jack and George Colman must have seen it is thereby fixed.

But what does it prove if Miller was rowing in his boat around the island on Sunday evening? The territory insists that he was rowing around the island to spy out a place to ambush Colman as he went to Seattle on the next morning. This is mere unfounded inference. Miller had lived within a quarter of a mile of this island for more than twelve years, and, according to the witnesses for the territory, knew every foot of it. What necessity was there for him to row around the island to spy out an ambush?

How did he know the route Colman was going to take to Seattle?

The distance between the island and the main-land at the place where Colman and Patten were killed is two miles.

How could Miller know that Colman would row in-shore at that place? This is the only act of the defendant proven which it was claimed showed antecedent preparation, and, while I agree that Miller's act in rowing around the island Sunday evening (if Miller was the person in the black boat) was a circumstance to give rise to speculation, and which might have some weight if there were other cogent circumstances pointing to Miller's guilt, on the state of the proof actually made it was a circumstance of no weight whatever.

4. Facts tending to connect defendant directly with the murder.

These are two. It was shown that Colman was killed by a bullet which might have been fired from a 40–60 Winchester rifle. It was proven that Miller owned such a rifle,

and that he had it with him at Knight's house the day before the murder. He habitually carried his rifle when going around the country. This circumstance, while relevant, was not very cogent.

Other rifle manufacturers make a 40–60 model; other people than the defendant owned 40–60 Winchester rifles.

The other circumstance is still weaker. Two witnesses, a man named Mahoney and a little girl named Olds, testify that they were at the house of Mr. Olds, on Mercer's Island, opposite the side of the island where the murder was committed, on Monday morning a little after eight o'clock.

At that time they saw a black boat out in the middle of the channel, between the island and the mainland, with a person in it whose features they did not recognize. The person had a shawl muffled about his or her head and shoulders, and sat upright when rowing. The boat was going north. This was the direction a person would row in order to reach Miller's home, who had been at the scene of the murder, passed around the southern end of the island, and then turned down the channel to go north towards Miller's. If this black boat was at the murder, it must have traveled over three miles in making the circuit to reach the place where it was seen by these two witnesses. Thus far the circumstance is of the weakest character; but it was attempted to give it strength by proving two other facts. It was shown that Miller generally sat unusually upright in his boat when rowing, but several of the witnesses called to testify to this fact said that his position was no more unusual than that of any other good oarsman. It was next attempted to show the whereabouts of every other black boat on Lake Washington save that of Miller's on the Monday morning of the killing. But the witnesses who attempted to name the owners of all the black or brown boats on the lake and its tributaries signally failed on cross-examination. The futility of attempting to make such proof will be seen when it is understood that Lake Washington has a shore line of at least one hundred miles, has several sloughs from eight to twenty-five miles long leading out from it into inhabited regions, and has a

river emptying into it and one running out of it—both re-
sorted to extensively by loggers, by means of boats, in the
prosecution of their business.  These two airy and inconclu-
sive circumstances are all that the testimony affords tending
even remotely to connect the defendant directly with the
murder.

5. Conduct of the defendant, when arrested for the crime,
indicating guilty knowledge.

Four days after the murder of Colman and Patten the
sheriff arrested Miller for the murder.  This was several
weeks before the bodies were discovered in the lake, but on
the same day that the empty boat with the coat and false
teeth of Colman in it, and with its bottom covered with
blood, was discovered on the beach of Mercer's Island.
Upon what evidence the arrest was made at this time is not
shown in the record.  The sheriff had disclosed to a neigh-
bor of Miller, while en route to Miller's, facts which led the
neighbor to believe that he was going to Miller's to arrest
the latter for the murder of Colman.  After the sheriff had
left, this neighbor sent one of his hired hands over to Mil-
ler's to find out if his belief as to the purpose of the sheriff
was true.  Owing to the fact that the sheriff was delayed
this man got to Miller's before the sheriff did, and it appears
that he disclosed to Miller the fact that the sheriff was com-
ing to arrest him for the murder of Colman.

When the sheriff arrived at Miller's house, he told him he
came there for the purpose of arresting him and his boys for
the murder of Mr. Colman.  The defendant asked, "What
Colman?"  The sheriff said, "You know very well what
Colman; J. M. Colman, the man you murdered."  After
the sheriff had Miller aboard the steamer bound for Seattle,
the sheriff asked him where he had first heard of Colman's
death, and he replied, "When you just told me."  The
sheriff then asked him how long Conway had been at his
house.  Conway was the man who had disclosed the coming
of the sheriff to Miller.  Miller answered, " He got there as
you did."

The sheriff then said to him, "Miller, don't you know

that you are lying? Don't you know that Conway had been at your house for fully half an hour when I got there?" Upon this, after some further questions and answers, Miller admitted that Conway had told him that the sheriff was coming to arrest him and his boys for drowning Colman. There is some more of this conversation, which is neither edifying nor instructive, and which it is unnecessary to detail. Does this conduct indicate guilty knowledge? I think not. Miller is an ignorant, illiterate man. He knew that the sheriff was coming to arrest him for the murder of Colman. To have appeared to be expecting it would have seemed, to him, to be in the nature of an admission of guilt, and it is not surprising therefore that he dissembled. Another reason for dissembling would be that suggested by my associate, namely, that Miller did not wish to disclose the agency of Conway in giving him information of the sheriff's coming.

After being taken to Seattle by the sheriff, Miller was discharged by the magistrate for want of evidence, and returned to his home. He remained there until arrested a second time.

This second arrest was made after the bodies had been found, but before that fact had been disclosed to Miller, so far as the sheriff knew. The sheriff, after arresting Miller the second time, asked him for his guns, and upon Miller's not readily complying with the request, told him he would have to search the house for them, and then proceeded to ask questions about the guns. Miller then said: "You can go ahead and make the search; you may find guns, and you may not. There, now, I won't say another word."

This was a most proper answer. The sheriff, with gross indecency, had accused Miller, when he first arrested him, of being a murderer, and had then beset him with all sorts of criminating questions. It was Miller's right to refuse to give the territory information. It was not only his right, but it was his positive duty to himself and his family, to refuse to converse with this officer. The course of the latter had indicated to Miller that he was seeking by every means in his power to encompass his conviction.

The most extraordinary incident connected with the second arrest occurred after the sheriff had taken the defendant on board the boat. I give it in the language of the sheriff:

"Shortly after we left Mr. Miller's house I placed a board across the forward guard of the steamer, on which I seated myself and the prisoner. As we came along down past the point where the bodies were found, he looked very steadily off in the opposite direction. We ran down past that point toward town, perhaps a quarter of a mile; then, at a signal from me, the captain turned the steamer about and we ran back to the point where the bodies were found, and ran the bow of the boat directly up on shore. Just as the keel was touching the shore, the prisoner jumped from his seat, and raised his elbow against the pilot-house and rested his head on his hand in about this manner" [indicating], "and fastened his eyes on the deck of the boat. He was trembling violently, his whole frame showing intense mental excitement. Mr. Ronald, Mr. Jacklyn, and one or two others aboard the boat went on shore to search for footprints or shells that might possibly be there, leaving me there with the prisoner alone. He would change his position from one foot to the other. I was standing close by. I said: ' Oh, you cowardly murderer, I would rather be in J. M. Colman's place than in yours.' After being there four or five minutes, he attempted to light his pipe. It was pleasant; had come out bright sunshine. In where we were there was no breeze blowing. He made three or four attempts to light matches, and his hand trembled so violently that it would blow the match out before he could light his pipe. After I made that remark the tears came to his eyes. He took his handkerchief out and used it vigorously for a moment, then he sat down on the seat."

What does the sheriff's testimony prove? The territory assumes that the defendant was agitated at being brought to the scene of the murder, and that the finding of the bodies not having been disclosed to him, his agitation was an involuntary confession. But may not his agitation be rea-

sonably accounted for on other grounds? Miller was in the hands of an officer whose hostility had been made plainly apparent at the time of his first arrest, and at this time also. The conduct of this officer in turning the boat abruptly from her course, and running her directly on shore, must have appeared extraordinary to him, and would have been sufficient to excite apprehension in the mind of any man situated as he was. Furthermore, he must have known, from disclosures made after his first arrest, that the bodies of Colman and Patten, if ever found, would be found somewhere on the shores of Lake Washington.

As he had been rearrested, he must have known also that further evidence in the case had been discovered, and that the bodies had probably been found. What is more natural than that he should associate the peculiar action of the sheriff with that or some other equally important incident in the drama which it was now certain was to be played, in which he was to be the chief actor, and in which the denouement was to be to him life or death? Viewed in this light, his agitation was not unnatural.

One more incident, and that more remarkable than the last, was introduced in evidence for the purpose of showing guilty knowledge on the part of the defendant. The sheriff, on the night of his arrival in Seattle with the defendant, introduced the latter into a room at the undertaker's, where the bodies of Colman and Patten, in their coffins, were then resting. I will let the sheriff again tell his own story:

"I proceeded with the prisoner into the building. I turned and walked around backwards, holding the prisoner's attention about this way" [indicating] "until I got opposite the coffin in which the body of young Patten was lying. As I arrived there I said, in this manner, to the prisoner, 'Look there;' and the prisoner glanced just a moment at the face of the corpse lying there, and then instantly lifted his eyes and looked in the direction of the wall. I tried to get him to look into the coffin again, but he refused.

"I asked him to look in there to see if he recognized the body as any person he had known while living; urged him as

much as I could to look into the coffin, but he refused. He said nothing, but simply continued to look in the opposite direction toward the wall. I then walked him in the same manner until I got him opposite the body of Colman, which was lying over further in the room to the right. I was walking backwards, and as I got him opposite that coffin I tried to get the prisoner to look in, but he would not.

"Q.—Did you say anything to him? A.—I asked him several times to look in there and see if he recognized the person; see if he had known the person while living; and finally I said, 'Mr. Miller, I want you to look in there and see the effects of your hellish vengeance. How do you feel, standing in the presence of the evidence of your crime?'

"Q.—What did he do? A.—He said absolutely nothing.

"Q.—How did he act? A.—He stood perfectly dumb.

"Q.—Make any noise; any audible noise? A.—Nothing except his breathing was heavy and labored."

I fail to see anything upon the part of the defendant in this whole scene which the most ingenious imagination can torture into an incriminating act. The witness said, in answer to the questions of the prosecuting attorney about the defendant's making an "audible noise," that his breathing was "heavy and labored." This I do not consider strange.

It is impossible for any person, whose mind is rightly constituted, to read the testimony of the sheriff concerning this incident, without his breathing becoming heavy and labored. If the mere reading the incident thus affects one not personally concerned, it is not strange that the chief actor and victim in the scene was similarly affected. I am glad to take leave of this officer and his testimony.

There is nothing else of an incriminating character against the defendant deducible from his conduct at the time of his arrest, or later, so far as the testimony discloses.

6. Destruction of inculpatory evidence.

There is only one incident in the case which it is claimed came under this head, and that is the failure to produce the Winchester rifle which was in the possession of the defendant on the day before the murder, and which was in his

possession on the day of his first arrest.   What became of
the rifle is not known.   The testimony of Sheriff McGraw,
before referred to, is all that there is in the case concerning
the rifle.   The defendant simply stood on his rights and
refused to answer questions which the sheriff had no right
to put to him.   Miller may have lost the rifle; he may have
sold it; it may have been stolen from him; a thousand things
may have happened to it.   There was no ground to assume
that he had destroyed it.   It is true, to go outside the scope
to which I had limited myself in this opinion, that the women
of Miller's family, when being cross-examined by the prose-
cuting attorney, after testifying for defendant on other points,
foolishly, and probably untruthfully, denied having ever seen
the rifle.   But Miller was not responsible for that; and such
denial, untruthful as it was, was no evidence that Miller's
wife and daughter thought him guilty.   It was merely evi-
dence that they considered the possession of the rifle an
incriminating circumstance against him, and were willing to
falsify the facts to do away with it.

I have now stated everything of consequence proven
against the accused by the territory, and, with a full sense
of the responsibility which I assume, I have no hesitation
in saying that no case whatever was made out against him
which, under our law, or under any system of law that I have
ever heard of, would justify his conviction of the crime of
murder.   He may be guilty; but in the eye of the law he is
innocent, because he has not been proven guilty.   God for-
bid that any person living under our laws, no matter how
humble, should be put in jeopardy of his life on mere
neighborhood suspicion, fanned into a flame by the theatri-
cal, dime-novel folly of an over-zealous officer.

I agree that the accused is entitled to a new trial, and
that he is entitled, on that trial, to an instruction of acquit-
tal, if, when the territory shall have closed its case, it has
not made a better case than that disclosed in the present
record.