McKINLEY, Plaintiff in error, v. STATE, Defendant in error.

*November 1—November 28, 1967.*

For the plaintiff in error there was a brief and oral argument by *Maurice L. Gorsky*, attorney, and *Michael W. Hogan* of counsel, both of Milwaukee.

For the defendant in error the cause was argued by
*E. Michael McCann,* assistant district attorney of Mil-
waukee county, with whom on the brief were *Bronson C.
La Follette,* attorney general, and *Hugh R. O'Connell,*
district attorney.

CURRIE, C. J. We are confronted with these three
issues:

(1) Were any of defendant's confessions involuntary
due to alleged psychological coercion exerted by the police
in taking defendant to the morgue to view the body of
the deceased?

(2) If any of the confessions are found to be invol-
untary, does this require granting of a new trial?

(3) Did the trial court commit prejudicial error by
giving to the jury instruction Wis J I—Criminal, Part I,
180, because it resubmitted to the jury the issue of the
voluntariness of the confessions?

*Voluntariness of Confessions.*

At about 8:15 p. m., on Saturday, September 18, 1965,
defendant, Means, and one Harmon were together on the
sidewalk of the 800 block of West Walnut street in the
city of Milwaukee. Defendant was thirty years of age
and the mother of two children. Means was her present
boyfriend and Harmon was a former boyfriend. The
state's evidence adduced at trial was that Means slapped
defendant and she then struck him with a knife which
pierced his heart and caused his death. Defendant also
struck Harmon in the shoulder with the knife and
wounded him.

The police were at once summoned to the scene where
they found defendant and the body of Means. One officer
testified that he questioned defendant, after informing
her that she did not have to answer any questions, unless
she had an attorney present of her own choosing. Defend-

ant consented to the questioning. She positively identified the injured person on the sidewalk as Aaron Means. She contended, at first, that a purse snatcher had stabbed Means but then admitted that she had stabbed him.

Defendant was then taken to the Safety Building where, at approximately 10:30 p. m. during an hour and one half interrogation, she orally confessed again in the presence of a detective and the police officer who had questioned her on the scene. The detective testified that she would state she stabbed him, and then retract her statement, on and off again. Both men testified that she identified a knife found at the scene of the crime as being the one she had used to stab Means. The detective testified that, before questioning her, he had told her that she did not have to make any statements, that any statements she did make could be used for or against her in a court of law, and that she had a right to counsel. The detective further testified that he was aware that the body of the deceased had been identified at the scene of the crime.

At approximately 10:45 p. m. two detectives, including the one who had just elicited the oral confession from her, took defendant to the county morgue in the basement of the Safety Building. The detective testified that the sole purpose of this trip was to get an identification of the body. He stated that this was done, even though two sisters of the deceased had already come to the morgue and identified the body. However, when later recalled to the stand, he testified that the sisters did not make their identification until after the defendant's first trip to the morgue.

This detective further testified: Defendant was crying, as they took her to view the corpse, and hesitated before entering the morgue and began crying louder. They showed her the upper one half of the unclothed body. The wound in the chest was apparent. When she saw the body, the defendant put her hands over her face, said

"I'm sorry," and cried. Although the defendant immediately identified the body, the viewing lasted five minutes. A stenographer accompanied the group to the morgue. While viewing the corpse, he warned defendant of her constitutional rights and then questioned her for identification purposes.

Defendant was then immediately taken back to the detective bureau, was questioned again, and orally confessed around midnight. She was then placed in a cell in the city jail and allowed to sleep.

At 11 a. m., Sunday morning, September 19th, the defendant was again taken to the morgue by two detectives to identify the body. Both testified that they were not aware that the body had been previously identified. The detective, who had elicited statements from the defendant, on Saturday evening, testified that he prepared his report that same night and indicated therein defendant's first trip to the morgue. An autopsy had been performed on the body at 9 a. m. that morning. One detective testified that only the corpse's face was exposed, and both detectives testified that the viewing lasted only a minute. They further testified that defendant did not protest being taken to the morgue. When she saw the body, one detective testified that she began crying, and said, "Oh, Aaron, I'm sorry."

The defendant was then immediately taken back to the detective bureau, was questioned again, and signed a written confession at 12:40 p. m. on Sunday, September 19th. Before the questioning she was advised as to her right to silence and her right to consult an attorney.

Defendant's testimony as to the two trips to the morgue differs from that of the law enforcement officers. She testified: When she arrived at the Safety Building on Saturday night, September 19th, the police asked her to identify the body. She told them she was afraid of dead people and gave them the names of the deceased's two sisters. The sisters of Means identified the body before

she did, and she spoke with one of the sisters prior to her first trip to the morgue. In addition to identification questions, "they asked me wasn't I sorry and then they asked me did I remember any more," while she viewed the body.

She further testified: Before her second trip, she told the detectives she had been there before. During the second viewing, the detectives removed the sheet from the post-autopsy corpse. The body was cut open and tied together with black strings, and that the stomach "was sinked in." She tried to close her eyes and turn her head away, but was forced by a detective to look at the body. A detective told her that they would continue to take her to the morgue, unless she "remembered more" about the murder.

On the basis of the foregoing evidence adduced at the hearing in the absence of the jury, the trial court found beyond a reasonable doubt the following:

All defendant's statements, while in police custody, were free and voluntary. She had been adequately advised of all her constitutional rights prior to the making of any statements. The trips to the morgue were only for identification purposes and were not intended to induce defendant to make a statement, and the trips had no effect on her later statements. No threats or promises had been made, and the totality of circumstances revealed no psychological coercion of any kind. The detectives who took her to the morgue on Sunday did not know that she had been taken there before. Defendant expressed no oral reluctance to these viewings.

In *Bradley v. State* [1] the Milwaukee police took an eighteen-year-old girl, suspected of strangling her two infant children, to the morgue, and allowed her to remain there with the dead bodies for thirty-five minutes. She confessed about seven hours later. This court found her confession to be a free and deliberate act due to the

---

[1] (1967), 36 Wis. 2d 345, 153 N. W. 2d 38.

events that occurred during the intervening period. She denied guilt for five hours after the viewing; was offered opportunity for food, rest, and medication; and consulted with her husband and her minister. She was warned of her rights to silence and counsel, and was not interrogated for substantial periods of time during this interval. We concluded that the viewing was too far removed from the time of the confession to have coerced the accused.

However, this court decried the conduct of the police in taking the girl to the morgue, terming it "reprehensible," "crude," "morbid," "harrowing," and "ghoulish," and stated:

"Counsel, during oral argument, found it impossible to defend this reprehensible conduct. The visit had no legitimate police purpose. There was no question of identification that might have required the mother to see these children." [2]

However, the state in its brief, and during oral argument, now attempts to defend this practice. In fact, it is stated that it is the custom of the Milwaukee police department in all murder cases. The state argues:

1. Although someone else could identify the body, such person might be unavailable at the time of trial;

2. An identification at the scene by defendant might be later stricken as improperly secured, because of insufficient warning as to rights;

3. The defendant has a right to see the body;

4. The defendant may have difficulty believing the victim to be dead, until the corpse is viewed;

5. The defendant may not know the name of the deceased, and may make a statement that would have to be linked to a certain corpse.

None of these reasons, with the exception of the limited circumstances, not present here, of the fifth one, con-

[2] *Id.* at 356, 153 N. W. 2d at 42, 43.

stitute a legitimate police purpose. All are too tenuous to justify the inherent danger of psychological coercion present in taking a suspect to the morgue during interrogation. If our society is so civilized as to demand that a suspect be warned of his constitutional rights before questioning, and to extend to a suspect the right to remain silent during questioning and to have an attorney present, it must eschew the barbarism of "corpse identification" during the process of interrogation.

The identification was not necessary in this case. The deceased had two sisters who adequately identified the body. Defendant "believed" Means to be dead, when one of the sisters informed her. There was no need for the grisly enlightenment of a personal view for five minutes. Furthermore, it is undisputed that the first viewing revealed the upper half of decedent's body, such that the stab wound in the chest was apparent. The testimony is disputed as to the extent of the body revealed on the second showing, and the trial court judge made no specific finding in that regard. The defendant's graphic description of the mutilated body did not seem to be the type of testimony one concocts.

The state contends that there was no attempt to overbear the will of the defendant, since only identification questions were asked her while viewing the body. However, after each occasion, she was immediately taken to the detective bureau and subjected to questioning. She confessed within one and one-half hours of each viewing, the first confession being verbal and the second written.

In *Davis v. United States* [3] the defendant was taken to the morgue, and after a forty-five-minute viewing of the victim, confessed. The court held the confession to be inadmissible, and described the police officer's conduct as " 'the theatrical, dime-novel folly of an overzealous officer.' " [4]

---

[3] (9th Cir. 1929), 32 Fed. 2d 860.

[4] *Id.* at page 864, quoting from *Miller v. Territory of Washington* (1888), 3 Wash. Terr. 554–580, 19 Pac. 50.

In *Stevenson v. Boles* [5] the police officer, at the scene of the crime, told the defendant he would be taken inside a certain building to see "something," unless he made a statement. The mutilated body of the victim was inside. Defendant could not have known this, unless he had committed the crime. Defendant confessed rather than enter the building. The court held that the defendant had a will not to confess, and was psychologically coerced into confessing by the conduct of the police. The confession was deemed inadmissible.

In *State v. Cook* [6] the defendant was taken to the scene of the crime to view the bodies of two little girls, who had had their throats slashed. A police officer forced the defendant's head within six inches of one of the bodies, and asked him if he committed the crime. Defendant confessed ten hours later. The court held that this police conduct was a relevant factor in the overall determination of voluntariness, and stated that, ". . . this type of over-zealous conduct might well tend to shatter an accused's mental composure." [7] The confession was deemed inadmissible.

We hold the last two of defendant's four confessions to be inadmissible. We reach this conclusion with full awareness of this court's tenet that:

"Where the court has made detailed findings of facts as was done here, our review of the evidentiary or historical physical facts will be limited to the same review that is used in other factual disputes heard and determined by a trial judge. The findings of the trial court will not be upset unless they are against the great weight and clear preponderance of the evidence." [8]

---

[5] (D. C. W. Va. 1963), 221 Fed. Supp. 411; affirmed (4th Cir. 1964), 331 Fed. 2d 939; modified (1964), 379 U. S. 43, 85 Sup. Ct. 174, 13 L. Ed. 2d 109.

[6] (1966), 47 N. J. 402, 221 Atl. 2d 212.

[7] *Id.* at page 416.

[8] *State v. Carter* (1966), 33 Wis. 2d 80, 90, 91, 146 N. W. 2d 466. *See also Greenwald v. State* (1967), 35 Wis. 2d 146, 150, 150 N. W. 2d 507.

In situations such as we have here, where a confession is made within an hour and one half or an hour and forty minutes after the police have taken the accused into the morgue to view the body of the deceased, the issue of the voluntariness of a confession should not be permitted to turn on a finding of the trial judge that such morgue viewing had no psychological effect in inducing the questioned confession. Rather, we deem that where the confession follows the morgue viewing as closely in time as occurred here it should be held as a matter of law that the confession is the result of such psychological pressure as to render the same involuntary.

It should be pointed out that the alleviating factors present in *Bradley* are absent here. Here there was no opportunity for rest or outside counselling, and the time intervals between viewings and confessions were substantially shorter.

Defendant's first two verbal confessions were given before she was taken to the morgue for the first time, and we approve the trial court's finding that they were voluntarily made.

### Effect of Holding Involuntary Two of the Four Confessions.

Our holding that two of the confessions were involuntarily made is grounded on violation of federal constitutional rights. This raises the issue of whether the harmless-error rule of sec. 274.37, Stats., invoked in *Pulaski v. State* [9] with respect to a constitutional viola-

[9] (1964), 24 Wis. 2d 450, 456, 129 N. W. 2d 204, certiorari denied, 380 U. S. 919, 85 Sup. Ct. 913, 13 L. Ed. 2d 803. For further application of this rule see *Whitty v. State* (1967), 34 Wis. 2d 278, 287–289, 149 N. W. 2d 557; *State v. Strickland* (1965), 27 Wis. 2d 623, 633, 135 N. W. 2d 295; *Wolke v. Fleming* (1964), 24 Wis. 2d 606, 618, 129 N. W. 2d 841, certiorari denied, 380 U. S. 912, 85 Sup. Ct. 897, 13 L. Ed. 2d 798.

tion, can be invoked here. If not, then a new trial is mandatory.

Independently of any confessions of defendant, there is overwhelming evidence introduced of defendant's guilt from the testimony of witnesses Williams, Goodwin and Harmon. Williams and Goodwin had been walking along the sidewalk of the 800 block of West Walnut street when the killing occurred. Williams testified that defendant's purse was snatched by some unidentified individual and that Means, Harmon and the defendant then went into a gangway and began arguing out of his sight. He testified that he heard a man say, "I told you to go home," then the sound of somebody being slapped, and a woman say, "Don't do that again." He then saw Means, bleeding from the chest, fall back on the sidewalk. He stated that after the incident Harmon had blood on his hand and shirt, and was holding his shoulder.

Goodwin testified: He saw defendant, Means and Harmon arguing on the sidewalk after the purse snatching. Defendant struck Harmon, Means then swung at defendant, and defendant then struck Means. Means then fell to the sidewalk and lay bleeding from the chest. He did not see whether defendant had a knife or any other instrument in her hand, when she swung at the two men. He testified that, after Means fell to the sidewalk, defendant hollered, "Oh, I killed this man."

Harmon testified: He, defendant, and Means had been drinking together, and they then separated. Shortly thereafter he was proceeding west on Walnut street, when he met the defendant proceeding in the opposite direction. Without provocation, she struck him in the shoulder. He did not see whether she had anything in her hand, but his shoulder bled. He backed away and then saw Means, bleeding from the chest, lying on the sidewalk.

Because the two invalid confessions were but cumulative in nature to the two preceding confessions which were voluntary, and because of the overwhelming evidence of

guilt independent of the confessions, we would invoke the harmless-error rule and deny a new trial if it were not for controlling decisions by the United States Supreme Court to the contrary.

In *Chapman v. California* [10] the court adopted a federal harmless-error rule to be applied by the states to violations of federal constitutional rights. The court held, ". . . that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." [11] However it was further determined that there are certain constitutional errors which can never be held to be harmless, regardless of their effect in a particular case. The majority opinion in *Chapman* states:

". . . our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as a harmless error. . . ." [12]

The court then cites by footnote *Payne v. Arkansas* [13] where the court stated that admission in evidence, over objection, of a coerced confession will always vitiate a judgment, because ". . . no one can say what credit and weight the jury gave to the confession." [14]

However, in his concurring opinion in *Chapman*, Mr. Justice STEWART states that the inapplicability of the harmless-error rule to coerced confessions does not turn on their evidentiary impact. Rather the constitutional right involved is so fundamental and absolute that it will not permit courts to indulge in nice calculations as to the harm arising from its denial.

---

[10] (1967), 386 U. S. 18, 87 Sup. Ct. 824, 17 L. Ed. 2d 705.

[11] *Id.* at page 24. In *Whitty v. State, supra,* footnote 9, this court noted that the *Chapman Rule* is substantially the same as the harmless-error rule adopted by this court in *Pulaski v. State, supra,* footnote 9.

[12] *Supra,* footnote 10, at page 23.

[13] (1958), 356 U. S. 560, 78 Sup. Ct. 844, 2 L. Ed. 2d 975.

[14] *Id.* at page 568.

*Haynes v. Washington* [15] controls the issue of whether we may apply the harmless-error rule in the instant case. In Haynes "substantial independent evidence" of guilt existed apart from the coerced confession. The defendant had given two prior oral confessions, determined admissible, and had been identified by witnesses as one of the robbers. Nevertheless, the court reversed the conviction. It cited as authority *Rogers v. Richmond,* [16] wherein the court stated that "ours is an accusatorial and not an inquisitorial system," [17] and that when "a defendant has been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the Fourteenth Amendment guarantees." [18]

Thus, a defendant is entitled to more than a due process which insures a reliable determination of his guilt or innocence. He is entitled to a due process which respects his human dignity. It is for this same reason that involuntary confessions are excluded, regardless of their trustworthiness. [19]

In view of the positive holdings of the United States Supreme Court that the harmless-error rule cannot be applied to a confession obtained in denial of due process, we have no other alternative but to reverse the judgment of conviction and sentence and the order denying new trial.

---

[15] (1963), 373 U. S. 503, 83 Sup. Ct. 1336, 10 L. Ed. 2d 513.

[16] (1961), 365 U. S. 534, 81 Sup. Ct. 735, 5 L. Ed. 2d 760.

[17] *Id.* at page 541.

[18] *Id. See also Lynumn v. Illinois* (1963), 372 U. S. 528, 537, 83 Sup. Ct. 917, 9 L. Ed. 2d 922, which stated that the harmless-error rule is an "impermissible doctrine" in regard to coerced confessions.

[19] See *State v. Hoyt* (1964), 21 Wis. 2d 284, 317a–317c, 124 N. W. 2d 47, 128 N. W. 2d 645.

## Instructions to Jury.

Because a new trial may be had in this matter, we deem it advisable to consider the issue raised by defendant with respect to the claim of prejudicial error of the trial court in instructing the jury.

The trial court properly did not inform the jury of his finding that the four confessions of defendant had been voluntarily made. The court's finding was made at the conclusion of a hearing, conducted in the absence of the jury, on the issue of the voluntariness of the confessions. This hearing was held pursuant to *State ex rel. Goodchild v. Burke* [20] wherein this court adopted the "orthodox rule" which provides that the trial judge shall determine the issue of voluntariness at a special hearing to be conducted in the absence of the jury.

In accordance with the "orthodox rule," the trial court instructed the jury as to the trustworthiness of the confessions. The instruction, which conformed to Wis J I—Criminal, Part I, 180, provided in part:

"If any statement against interest made to the police was obtained from the defendant by abuse, force, threats, coercion, inducement of promises, or while the defendant was under the influence of fear of physical punishment by those having her in custody or questioning her, it is untrustworthy and you should wholly reject any such statement or parts of statement so obtained."

In attacking this instruction, defendant's brief quotes this statement from the United States Supreme Court's decision in *Jackson v. Denno*: [21]

"The admixture of reliability and voluntariness in the considerations of the jury would itself entitle a defendant to further proceedings in any case in which the essential

---

[20] (1965), 27 Wis. 2d 244, 133 N. W. 2d 753, certiorari denied, 384 U. S. 1017, 86 Sup. Ct. 1941, 16 L. Ed. 2d 1039.

[21] (1964), 378 U. S. 368, 84 Sup. Ct. 1774, 12 L. Ed. 2d 908.

facts are disputed, for we cannot determine how the jury resolved these issues and will not assume that they were reliably and properly resolved against the accused." [22]

In the light of this holding, the defendant argues that the instruction in the present case was unconstitutional, because, under the general verdict of "guilty" returned by the jury, it is impossible to tell whether "the jury did or did not rely upon the confession, and leaves the defendant without recourse if such a rejection occurred, to know if the verdict is supportable on the other evidence presented."

This argument misconceives the rationale of *Jackson v. Denno* which is that a defendant has the constitutional rights to have an involuntary confession entirely disregarded in the determination of his guilt or innocence, and to have the voluntariness issue fairly and reliably determined. [23] The court held that these rights could only be protected by the trial court making an independent determination on the issue of voluntariness, before the confession is admitted into evidence for consideration by the jury in its adjudication of guilt or innocence.

In *Pinto v. Pierce*, [24] recently decided, the court held that voluntariness hearings need not be held, under all circumstances, outside the presence of the jury, although it would be prudent to do so, since a confession may be found to be involuntary and inadmissible. This case focuses the thrust of *Jackson*—that is, to prevent juries from considering involuntary confessions. In *Jackson* the court held that either the Massachusetts rule, which allows the jury to redetermine voluntariness, or the orthodox rule, which allows the judge alone to determine voluntariness, is constitutionally permissible.

In *Goodchild* this court decided to adopt the orthodox rule. If, in fact, a trial court still uses the Massachusetts

[22] *Id.* at page 387.
[23] *Id.* at page 389.
[24] (1967), 389 U. S. 31, 88 Sup. Ct. 192, 19 L. Ed. 2d 31; 2 BNA Criminal Law Reporter 3009.

rule and allows the jury to redetermine the issue of voluntariness, the defendant is not harmed. In *Jackson* the court stated:

"Once the confession is properly found to be voluntary by the judge, reconsideration of this issue by the jury does not, of course, improperly affect the jury's determination of the credibility or probativeness of the confession or its ultimate determination of guilt or innocence." [25]

Once the trial judge makes a finding of the voluntariness of the confession, which finding is supported by the evidence, it is immaterial whether or not the jury also passes on the voluntariness issue in rendering a general verdict of guilty. This is very clear from the disposition of the case ordered in *Jackson v. Denno*. At the trial of Jackson the jury was permitted to consider the voluntariness issue. They rendered a general verdict of guilty. The United States Supreme Court directed that the case be remanded to the state court so that a factual hearing could be conducted with respect to the voluntariness of the confession. The opinion stated that if the confession was then found to have been voluntarily made there was "no constitutional necessity at that point for proceeding with a new trial, for Jackson has already been tried by a jury with the confession placed before it and has been found guilty." [26] This was held even though Jackson was under a death sentence.

The objective of the separate hearing and factual determination required by *Goodchild* [27] is to determine the voluntary character of the confession or admission, while that of Wis J I—Criminal, Part I, 180, is to determine its trustworthiness (truthfulness). The two are not the same as pointed out in *Jackson v. Denno* wherein the court stated:

---

[25] *Supra*, footnote 21, at page 378, footnote 8.
[26] *Id.* at page 394. *See also Phillips v. State* (1966), 29 Wis. 2d 521, 531, 139 N. W. 2d 41.
[27] *Supra*, footnote 20.

". . . Since the evidence surrounding the making of a confession bears on its credibility, such evidence is presented to the jury under the orthodox rule not on the issue of voluntariness or competency of the confession, but on the issue of its weight. Just as questions of admissibility of evidence are traditionally for the court, questions of credibility, whether of a witness or a confession, are for the jury. . . ." [28]

For the reasons stated we find no merit to defendant's contention that the instruction given was unconstitutional or contrary to the holding of *Jackson v. Denno*.

*By the Court.*—Judgment and order reversed, cause remanded for further proceedings consistent with this opinion.

---

[28] *Supra,* footnote 21, at page 386, footnote 13.