RAFFERTY, Plaintiff in error, v. STATE, Defendant in error.

*December 3, 1965—January 4, 1966.*

471

For the plaintiff in error there was a brief and oral argument by *Neil J. Toman* of Madison.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, with whom on the brief were *Bronson C. La Follette*, attorney general, and *William A. Platz*, assistant attorney general.

HEFFERNAN, J.

*Denial of counsel prior to trial.*

Rafferty claims that after his arrest he was held in custody by the Madison police department without the opportunity to consult or advise with counsel for over forty hours. We have previously cautioned against such police conduct and have pointed out that:

"Such detention casts a doubt upon the validity of police methods of crime detection, constitutes an abuse

to the arrested individual and may raise a question of the voluntariness of the acts performed and the statements made by the accused during that period of time." *Pulaski v. State* (1964), 23 Wis. (2d) 138, 145, 126 N. W. (2d) 625.

However, this alleged abuse of the criminal process is raised for the first time in the brief and oral argument of counsel. There is nothing of record that would properly bring this contention before us. As we have previously said, our review of a judgment on writ of error is necessarily limited to the correction of errors that appear on the face of the record. *Sparkman v. State* (1965), 27 Wis. (2d) 92, 96, 133 N. W. (2d) 776; *Babbitt v. State* (1964), 23 Wis. (2d) 446, 450, 127 N. W. (2d) 405. In *Sparkman, supra,* we held that the contention that the defendant appeared at the preliminary hearing in manacles could not be considered by this court on writ of error when the record is silent in that regard.

We point out, however, that even though the record did show an unlawful detention, there has been no claim made that there was causal connection between the detention and the subsequent plea. Additionally, "Some showing must be made why the preservation of the constitutional issues were not waived by his subsequent plea of guilty." *Pulaski, supra,* page 146.

Not having raised this alleged error on the record below by a motion to withdraw the plea, this matter is not before us.

### *Waiver of counsel and plea of guilty.*

Additionally, the defendant claims that he did not freely and intelligently waive his right to counsel at the time of arraignment. Again, this matter is initially raised in this court and not by the appropriate motion in the trial court. We held in *Van Voorhis v. State* (1965), 26 Wis. (2d) 217, 223, 131 N. W. (2d) 833, that:

"A claim that defendant was not properly advised cannot be raised as a matter of right on review of the judgment unless the claim was raised in the trial court before judgment. If not so raised before judgment, the claim can be raised here by appeal from the order of the trial court, after judgment, denying an application on that ground for a new trial or leave to withdraw a plea."

The record, however, of the proceeding at arraignment is before us and in the discretion of the court it may review matters of record though not raised initially and properly in the trial court.

Upon a review of that record, we conclude that the defendant intelligently and voluntarily waived his right to counsel. He was advised of his right to have counsel at public expense and of the consequences of his plea and the possible duration of sentence. He was informed in detail of the factual basis for the charge against him, and the use of coercion, duress, or promises was inquired into. The court asked no questions in regard to the defendant's educational background or level of intelligence. However, the questions and responses to them were of a nature that the judge could adequately appraise the defendant's intelligence. Moreover, the record shows that the judge was aware of the defendant's previous criminal record and his frequent brushes with the law. A review of the record makes it apparent that counsel was waived and the plea of guilty entered freely, voluntarily, and understandingly. That is all that justice and due process require. *State ex rel. Kline v. Burke* (1965), 27 Wis. (2d) 40, 45, 133 N. W. (2d) 405.

*Pellet gun a dangerous weapon within the meaning of sec. 943.32 (2), Stats.*

The defendant is charged with violation of sec. 943.32 (1) and (2), Stats., which provide as follows:

"(1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of

the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; or

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) Whoever violates sub. (1) while armed with a dangerous weapon may be imprisoned not more than 30 years."

The information charges that he was "armed with a dangerous weapon, to wit, a pellet gun."

Counsel contends that a pellet gun is not a dangerous weapon in the purview of the statute.

Sec. 939.22 (10) defines "dangerous weapon" as:

". . . any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, or any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm."

Sec. 939.22 (14) defines "great bodily harm" as:

". . . bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury."

A pellet gun is not a firearm. A firearm is defined by Black's Law Dictionary as "a weapon which acts by force of gunpowder."

The question, however, is whether a pellet gun is a "device designed as a weapon and capable of producing death or great bodily harm." It is clear that a pellet gun is a weapon. In W. H. B. Smith, Gas, Air, & Spring Guns of the World, Military Service Publishing Com-

pany (1957), the following definition appears at page 169:

"A compressed-air gun (or rifle or pistol) is an arm in which the air which furnishes the force to propel the pellet (or ball, bullet, dart, or spear) is compressed in a chamber, which may be housed within the arm or may be attached directly to it."

The record does not disclose the exact nature or make of the pellet gun used. The transcript reveals that the gun was "pumped up." Smith, *supra*, page 169, points out that in England pump guns are by law limited in muzzle velocity and those that exceed the limitations are declared to be firearms and are subject to severe restrictions as to use. In discussing American pump pellet guns, Smith states (p. 169):

"The number of pumping strokes determines the variable power, which can considerably exceed European police regulations."

The Benjamin pump pistol will penetrate about one-fourth inch of pine (Smith, *supra*, p. 176). A pump-gun rifle may penetrate as much an an inch into a pine board (*supra*, p. 172). Smith states that the Sheridan Super pump rifle has a muzzle velocity of 770 feet per second, and "pests or vermin can be killed as much as 60 yards or 70 yards distance from the muzzle. The Sheridan has been used as a rat exterminator on the Los Angeles dumps, as a hog stunner for slaughtering on farms, and for killing trapped foxes. . . ." (*supra*, p. 191).

Richard Leofric Jackson, Assistant Commissioner, Criminal Investigation Department, New Scotland Yard, London, writes in the text, Criminal Investigation:

"Although not, strictly speaking, a firearm, it should be remembered that the modern airgun or so-called air rifle will fire a bullet up to .22 with accuracy up to ranges of at least fifty yards, and that serious damage can be done with one of these weapons at considerably

longer ranges." (Gross, Criminal Investigation, 5th ed., by Jackson, p. 217.)

It is undoubtedly true that a pellet gun is less lethal than the usual firearm, and the gun used in the robbery was apparently not a rifle; however, the facts set forth above make it clear that the pellet gun is not a toy, but is potentially a weapon of great effectiveness and utility.

Our court in *Harris v. Cameron* (1892), 81 Wis. 239, 51 N. W. 437, held that a Daisy BB gun was not a weapon of such a nature that it was negligence *per se* for a father to give it to a child. That case is not authority for holding that a pellet gun is not a dangerous weapon, for the question in *Harris* was that of the father's civil liability. Moreover, *Harris* made much of the fact that the Daisy was a "mere toy or plaything for boys."

The information quoted above shows that pellet guns are not "mere toys."

The record shows that Rafferty and a companion robbed a filling station and used the pellet gun in the commission of the crime. The defendant pulled the pellet gun on the attendant and demanded the money on his person and in the cash register. The attendant was at gunpoint forced to lie on the floor. While he was in that position, the defendant struck him on the head with the pellet gun. The impact discharged the gun, and the pellet embedded itself in the wall.

The fact that the pellet was thus embedded is evidence of the striking power of a pellet gun at close range. We conclude that a pellet gun used as a compressed-air weapon is a dangerous weapon calculated or likely to produce great bodily harm.

Moreover, the gun, used as a bludgeon, was a dangerous weapon. This court, even prior to the statutory change which included an "unloaded firearm" in the definition of dangerous weapon (sec. 939.22 (10), Stats.), recognized that a pistol used to strike with is a dangerous

weapon. *Schiner v. State* (1922), 178 Wis. 83, 189 N. W. 261.

The California supreme court has held that a toy cap pistol used as a bludgeon is a dangerous weapon. *People v. Ward* (1948), 84 Cal. App. (2d) 357, 190 Pac. (2d) 972; *People v. Coleman* (1942), 53 Cal. App. (2d) 18, 127 Pac. (2d) 309. A recent Maryland case, *Jackson v. State* (1963), 231 Md. 591, 191 Atl. (2d) 432, held that a starter's pistol, which could not discharge a bullet, was a dangerous weapon because it could be used as a bludgeon and because it had the appearance of a lethal gun. We have no hesitancy in holding that the pellet gun when used as a bludgeon, in this case to strike the filling station attendant, is an "instrumentality which, in the manner it is used . . . is calculated . . . to produce . . . great bodily harm."

### Can accused after a plea of guilty question the evidence?

The plaintiff, after a plea of guilty now contends that there was no evidence that force was used in the commission of the crime as required by statute, that the blow to the head of the attendant was not in the commission of the robbery, but was to facilitate escape. His argument is essentially that there was no evidence or insufficient evidence to show that force was used in committing the robbery. As we have said in *Hawkins v. State* (1965), 26 Wis. (2d) 443, 448, 132 N. W. (2d) 545:

". . . a plea of guilty, voluntarily and understandingly made, constitutes a waiver of nonjurisdictional defects and defenses."

In that case, it was held that the defendant waived his right to object to the use of evidence that he claimed was illegally seized. In *State v. Lampe* (1965), 26 Wis. (2d) 646, 648, 133 N. W. (2d) 349, Mr. Justice HALLOWS stated:

"By the plea, the defendant admitted the facts charged but not the crime and in this respect a plea of guilty is like a demurrer."

We deem that Rafferty by his plea of guilty has not only waived any objection to the legality of the evidence, but also to the quantum of it. He cannot now claim that there was insufficient evidence to sustain conviction on his plea of guilty.

*By the Court.*—Judgment affirmed.