STATE, Respondent, v. BURNETT, Appellant.*

*February 4—April 12, 1966.*

---

* Motion for rehearing denied, without costs, on June 7, 1966.

376

378

For the appellant there was a brief and oral argument by *Lloyd A. Barbee* of Milwaukee.

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *William A. Platz,* assistant attorney general.

FAIRCHILD, J.   Four issues are presented: (1) Was a confession improperly admitted in evidence, either because Burnett was unable to appreciate his constitutional rights and therefore incapable of waiving them when he made the confession, or because he was not represented by counsel when interrogated? (2) Was Burnett prejudiced by the court's submitting the voluntariness of the confession to the jury? (3) Was the jury chosen from an improper array? (4) Were Negroes systematically excluded from the jury list?

(1) *The confession.*   Charles De Luca and a young lady were in a parked automobile in South Shore Park about 12:30 a. m., October 13, 1945. Men came to the car, required them to get out, and in a struggle which developed near the car, De Luca was fatally wounded.

Chester Wright testified that in October, 1945, he and Burnett and a man named Scott were staying at a rooming house in Racine. On the night in question, after doing some drinking, they drove to the park in Scott's car. There had been conversation about robbery. Wright

had a gun and Burnett a knife. Wright and Burnett left Scott's car and came up to De Luca's, one on each side, and forced the couple out. Wright took De Luca's wallet. They marched the couple away from the car so that the three men could have a head start in getting away. Suddenly De Luca turned and knocked Wright down, and they scuffled. Burnett told Wright to shoot, but Wright had dropped his gun. Apparently in an effort to aid Wright, Burnett cut De Luca from the back, and cut Wright's right hand, which was then on De Luca's shoulder. They then ran to Scott's car, went back to the rooming house and got their things, and drove to St. Joseph, Michigan, by way of Chicago. The car became disabled on the highway, and a police officer noticed and talked to them. Later the police picked them up.

Burnett described the same episode. He denied, however, that he had stabbed De Luca, or made any use of his own knife. He testified that he did attempt to intervene in the fight, but his testimony suggests that De Luca must have had a knife with which he cut Wright's hand, and that Wright must have got hold of the knife and stabbed De Luca. After interrogation at St. Joseph, Burnett had signed a statement, the admissibility of which is challenged. In the statement Burnett admitted that after Wright and De Luca scuffled and fell down, Burnett came up and "swung" his knife. He was unable to say how many times he hit De Luca, but on one of the times he swung it, he hit Wright on the hand and cut him.

Racine police officers who were in the vicinity of the De Luca car at the time of the event heard the screams of De Luca's companion and came on the scene soon after the men had left. In the course of their investigation, they happened to check at the rooming house, noticed blood which apparently came from Wright's wound, obtained descriptions of the men and the license number of the car, and sent out an all-points bulletin.

The three men were picked up just before 3 a. m., and were placed in cells at the jail at St. Joseph. They were

questioned about 9 a. m. by Leo Cook, an FBI Agent, and Sheriff Ervin Kubath. The two-page statement was written by Cook and signed by Burnett.

Before the statement was admitted in evidence, the court heard testimony in the absence of the jury. At the close of that hearing, the court summarized the testimony and stated that "such a prima facie showing has been made as to entitle the statement to have the consideration of the jury and it will be allowed." When the case was submitted to the jury, the court instructed that in order to be considered, the statement must be the free and voluntary statement of the defendant, and gave further instructions upon the issue of whether the statement was free and voluntary. Thus the court appeared to follow the practice in this state prior to the decision of the supreme court of the United States in *Jackson v. Denno*.[2] This practice submerges in the ultimate verdict the finding on the issue of voluntariness, and, as held in *Jackson*, is inadequate to insure a reliable and clear-cut determination of voluntariness, as required in order to afford due process of law. Such requirement, however, is satisfied by the so-called "orthodox rule, under which the judge himself solely and finally determines the voluntariness of the confession, or . . . the Massachusetts procedure, under which the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused."[3] In *Jackson* itself, the supreme court did not order a new trial, but left that question to be decided after a separate determination of the issue of voluntariness by the state court.

Judge DuRocher, in ruling upon motions after verdict in the instant case, made it plain that he had been convinced by the evidence that the statement was "the free and voluntary product of the unconstrained will of the defendant" and that defendant "appreciated and was capable of appreciating his right to remain silent."

[2] (1964), 378 U. S. 368, 84 Sup. Ct. 1774, 12 L. Ed. (2d) 908.
[3] *Jackson v. Denno, supra,* footnote 2, page 378.

We consider that the procedural requirement, of *Jackson,* that there be a reliable and clear-cut determination of voluntariness has been fulfilled. The issue now before us is not merely, however, whether Judge DuRocher's finding was against the great weight and clear preponderance of the evidence. ". . . since the question is whether a constitutional right has been violated, it is the subject of our independent determination on this review." [4] In such determination we give appropriate weight to the trial judge's advantage in determining credibility of witnesses by virtue of his opportunity to hear and observe them, but we are mindful of our obligation to be satisfied, from the totality of circumstances disclosed by the record, and applying due-process standards, whether or not Burnett's statement was voluntary.

Remarkably, in view of the lapse of nineteen years, the state was able to produce as witnesses, Agent Cook, former Sheriff Kubath, Louis Hardy, an assistant district attorney of Racine county in 1945, and Walter Becker, the then undersheriff of Racine county. The latter two had accompanied the then sheriff, now deceased, to St. Joseph. After waiver of extradition, they brought Burnett, Scott and Wright back to Racine.

Cook testified that the three men were interviewed separately in the sheriff's office. Burnett was cooperative and very readily stated the facts. The individual interrogations did not extend over forty minutes. The sheriff asked a few questions, and was the only other person present. Cook told Burnett at the outset who he and the sheriff were, that Burnett did not have to furnish information and anything he did say could be used against him in court. The first paragraph of the statement signed by Burnett asserts that he had been so told. Burnett read the statement before he signed it. Cook testified that Burnett appeared remorseful and desirous of getting the information "off his chest;" that Burnett

[4] *Phillips v. State* (1966), 29 Wis. (2d) 521, 527, 139 N. W. (2d) 41.

had no problem in expressing his thoughts, was candid, and appeared to understand the situation.

Former Sheriff Kubath's testimony corroborated that of Cook. He also stated that food had been provided the three men before they were questioned.

Burnett testified that one of the arresting officers rammed a gun in his side at the time of arrest, and later, at the jail, asked him whom he killed in Racine. When Burnett denied any killing, one of the officers kicked him in the leg, raising a knot on it, and said he was going to have to tell a better story than that. He testified that when interviewed by Agent Cook, he at first denied the murder. Cook said, "You better give me a statement or something worse can happen to you." Burnett testified the questioning lasted an hour or an hour and a half; that he was not told of his rights; that he read or looked at the statement, but did not understand it; that he was frightened during the questioning.

Burnett was twenty-five years old at that time, had completed the fifth grade in school. He had received a score of 75 on an I.Q. test. He was not certain whether on other tests he may have received a higher score. He had been arrested several times as a juvenile, and had twice been arrested for criminal offenses, had pleaded guilty and been sentenced.

Wright was permitted to testify that during his interview, the sheriff was pricking him on the side of the leg with the knife until Cook told him to stop. Both Kubath and Cook denied this claim.

Hardy and Becker saw Burnett later in the day. They described Burnett as calm, remorseful, and not reluctant to talk. The next day the three men were taken before a judge who advised them they need not consent to return to Racine, but all agreed to waive extradition. Burnett made no complaints nor exhibited any claimed injury either at St. Joseph or when returned to Racine.

Evidently Judge DuRocher believed the testimony of the officers and disbelieved Burnett's where there was a conflict.

We have held "that there is no hard-and-fast rule that an accused must be informed of his constitutional right not to incriminate himself as a condition precedent to admission into evidence of any admissions or confessions made to the police." [5] We do, however, consider the giving of such advice an advisable police practice so as to make certain that the right is known and understood, rather than to rely upon an assumption that the ordinary individual has such awareness. Burnett had limited schooling and less than average intelligence, although he was an adult, with previous experience in criminal prosecutions. Even if it be assumed that he would be unaware of his right to decline answers to questions put by officers, there is credible evidence here, believed by the trial judge, that he was expressly informed of that right. He signed a statement admitting he had been so informed, and Judge DuRocher considered that "he appreciated and was capable of appreciating his right to remain silent." We reach the same conclusion.

It is undisputed that Burnett was not accompanied by counsel when questioned, was not told he could have counsel, and did not request counsel. This raises a question in the general area of *Escobedo v. Illinois*,[6] although it is clear that in this case two of the elements which the supreme court of the United States listed in holding Escobedo's statements constitutionally inadmissible are absent.[7] Here there was no request for an opportunity

---

[5] *Holt v. State* (1962), 17 Wis. (2d) 468, 479, 117 N. W. (2d) 626; *Browne v. State* (1964), 24 Wis. (2d) 491, 511g, 129 N. W. (2d) 175, 131 N. W. (2d) 169; *State ex rel. Goodchild v. Burke* (1965), 27 Wis. (2d) 244, 257, 133 N. W. (2d) 753.

[6] (1964), 378 U. S. 478, 84 Sup. Ct. 1758, 12 L. Ed. (2d) 977.

[7] Id. at 491.

to consult with a lawyer, and Burnett was effectively advised of his right to remain silent.

Although we held that the record made at the time of Burnett's arraignment in 1945 reflected insufficient constitutional protection of his right to counsel and left us in doubt that he made an intelligent waiver of such right,[8] we deem, on the present record, that he could and did sufficiently appreciate his right to remain silent, and made a deliberate choice to speak. As suggested in the earlier *Burnett* opinion, one who chooses to plead guilty without advice of counsel foregoes the possibility that a lawyer may discover defenses or mitigating circumstances which would not be apparent to a layman. At the stage of questioning after arrest, however, the important assistance which a lawyer could be expected to provide would be advice concerning the right to remain silent, and that advice was given to Burnett.

We, accordingly, determine that Burnett's confession was voluntary and that he was not deprived of assistance of counsel.

(2) *Submission of voluntariness to the jury.* The trial judge first determined that the evidence showed, *prima facie,* that the statement was voluntary, and submitted the issue of voluntariness to the jury. He later, however, went beyond ruling that the evidence was sufficient to show the statement was voluntarily given, and stated that he had been so convinced.

This court has decided that in these cases the so-called orthodox rule applies.[9] The determination of voluntariness is made solely by the judge and is not submitted to the jury. Under the instructions given in this case, Burnett was given an opportunity he would not enjoy under the orthodox rule, a chance to have the jury disregard his confession if the jury was not satisfied it was voluntary. No prejudice to Burnett could have resulted.[10]

---

[8] *State ex rel. Burnett v. Burke, supra,* footnote 1, at page 492.

[9] *State ex rel. Goodchild v. Burke, supra,* footnote 5, at page 264.

[10] See *Phillips v. State, supra,* footnote 4, at page 531.

(3) *Challenge to the array.* At the beginning of the *voir dire* examination of prospective jurors, counsel for Mr. Burnett orally challenged the array. He made it clear that the sole ground was alleged systematic exclusion of Negroes. No proof was offered other than counsel's statement that Negroes comprise six percent of the population of the city of Racine and that the panel then present did not contain a proportional number. Counsel requested that the jury commissioners be subpoenaed and a hearing had. The court denied the request and the challenge.

The matter was raised again, after verdict, as a ground for a new trial. The court did not consider that it had erred originally, but held a hearing because of the importance of the claim. After hearing, it was again denied.

Near the close of the hearing counsel pointed out alleged violations of procedure required by sec. 255.01, Stats., governing the selection of jurors. We consider that the objections on these new grounds came too late, and were waived.[11]

(4) *Alleged exclusion of Negroes.* The three present jury commissioners of Racine county, and one former commissioner, testified. Each described the procedure by which he selected names of prospective jurors from polling lists, directories, and the like. These sources do not disclose race, and, except for a few instances of personal acquaintance, the commissioners were unaware of the race of persons selected. Each testified that race was in no way concerned in the selection.

Defense counsel contends that a gross under-representation of Negroes has been established, sufficient to compel the inference that there has been systematic exclusion, though denied by the commissioners.

According to the 1960 census, the nonwhite population of Racine county (only slightly larger than the Negro population) was 3.85 percent (5,459) of the total (141,-781). It had risen from 1.71 percent in 1950.

[11] *Ullman v. State* (1905), 124 Wis. 602, 607, 103 N. W. 6.

One witness, Mrs. Monroe, testified to a check she had made of lists of prospective jurors in the county. She had very wide acquaintance with the Negroes in the community and she identified the names she recognized as belonging to Negroes. Six other witnesses with wide acquaintance corroborated her identifications. Each conceded the possibility that a name actually belonging to a Negro might not be recognized by him.

Many of the exhibits were apparently official documents or books, have been withdrawn, and were not returned here as part of the record.

The facts are reflected, however, in the transcript of testimony.

The total number of names submitted by the commissioners in certain recent years for the circuit court jury lists (circuit and county court since January 1, 1962) and the number of Negroes in each group, identified by Mrs. Monroe and the other witnesses, are as follows:

| Date | Negroes | Total |
|---|---|---|
| 8/15/52 | 0 | 163 |
| 9/11/53 | 1 | 121 |
| 3/4/55 | 0 | 150 |
| 3/12/57 | 0 | 150 |
| 3/16/59 | 0 | 150 |
| 8/29/60 | 4 | 150 |
| 2/27/61 | 5 | 150 |
| 3/6/62 | 4 | 226 |
| 2/18/63 | 3 | 302 |
| 9/6/63 | 1 | 150 |
| 3/3/64 | 2 | 171 |
| 9/29/64 | 0 | 173 |
| Total | 20 | 2,056 |

The overall percentage, 20 out of 2,056, is approximately one percent. The highest percentage in any one list (2/27/61) is approximately three percent.

The number of Negroes whose names were submitted for municipal court jury lists in certain years prior to 1962, and the total of all names in all lists are as follows:

| Date | Negroes | Total |
|------|---------|-------|
| 8/30/49 | 1 | (no totals |
| 1/26/53 | 1 | for individual |
| 7/12/54 | 2 | lists) |
| 2/20/56 | 2 | |
| 11/27/57 | 2 | |
| 2/17/59 | 5 | |
| 8/16/61 | 2 | |
| Total | 15 | 1,759 |

The overall percentage, 15 out of 1,759, is .8 percent. There was also testimony that in some instances when 36 or 52 names were drawn for service at a term of court there were one or two Negroes in the group, and in some instances there were apparently none. Three attorneys practicing in Racine county testified that they recalled trying cases when there had been one or two Negroes in the array for the particular case, and cases where a Negro had served on the jury. Forty-one veniremen were present for trial of the Burnett case, and one of them was a Negro, although he was not ultimately selected as a juror.

The cases relied upon by the defense, where an inference of systematic exclusion has been drawn from a gross disparity between the proportion of Negroes in the population and the proportion of Negroes on the jury list, involve very much greater discrepancies than are present here.[12] We conclude, as did the trial court, that the facts presented here do not compel the inference, in the face

[12] *United States ex rel. Goldsby v. Harpole* (5th Cir. 1959), 263 Fed. (2d) 71; *United States ex rel. Seals v. Wiman* (5th Cir. 1962), 304 Fed. (2d) 53.

of the commissioners' testimony to the contrary, that there has been systematic exclusion of Negro jurors.

*By the Court.*—Judgment affirmed.