BRADLEY, Plaintiff in error, v. STATE, Defendant in error.*

*September 11—October 6, 1967.*

---

* Motion for rehearing denied, without costs, on December 22, 1967.

348

For the plaintiff in error there was a brief and oral argument by *Richard A. McDermott* of Milwaukee.

For the defendant in error the cause was argued by *E. Michael McCann,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Hugh R. O'Connell,* district attorney.

HEFFERNAN, J.

*Were the confessions voluntary and
the product of deliberation?*

Sherry Bradley stated that at about 2 a. m. on May 22, 1964, she returned home and discovered there was something wrong with her two infant children. She called a neighbor, who unsuccessfully attempted mouth-to-mouth resuscitation. He called an ambulance and shortly thereafter the police appeared upon the scene and commenced their investigation. Sherry, together with neighbors and other members of her family, was questioned by the police at the apartment until about 3 a. m. She was then taken to the Safety Building for further questioning. She was questioned intermittently thereafter and at approximately 2 p. m. on the afternoon of May 22d, she gave an oral confession that she had strangled her two children. Thereafter, she gave the police a narrative statement of the murders and, a few minutes later, permitted a court reporter to take a question-and-answer confession. She was thereafter charged with two counts of first degree murder.

Prior to trial, defense counsel objected to the admission of the confessions as being involuntary and asked that there be a separate hearing prior to trial, out of the presence of the jury, in order that the court could make that determination. The court directed, however, that the hearing be held at the point during the trial, out of the presence of the jury, when it appeared that the introduction of the confessions into evidence appeared imminent. A hearing, before the court alone, was held during the trial and thereafter the judge made the following findings:

"This Court having heard the said testimony regarding the exhibits marked for identification as Exhibits 4 and 5 and referred to as the confessions, the Court is

convinced that they were the free and deliberate acts of the defendant.

"The Court is further convinced that this defendant was not deprived of any right to eat nor to consume food but that it was offered to her.

"The Court is also convinced that she was asked and given an opportunity to have an attorney.

"The Court is further convinced from the said evidence that she was given an opportunity to talk with her confessor.

"She was also given an opportunity to talk with her own husband.

"The Court is further convinced she was not subjected to any duress nor any threats nor any force or any said promises.

"The Court rules Exhibits 4 and 5 may be received into evidence."

It should be noted at the outset that the procedure followed by the court does not exactly conform to that suggested in *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753, in that the hearing on voluntariness took place during trial rather than prior thereto. In addition, the trial court, having found the confession voluntary, thereupon admitted the confession in evidence but instructed the jury, in accordance with the Massachusetts rule, which we declined to follow in *Goodchild*, to again consider the voluntariness of the confession. We hasten to add, however, that the trial herein was held in December of 1964 and the date of our mandate in *Goodchild* was March 30, 1965. We do not, therefore, conclude that the procedure was erroneous, particularly in view of its substantial compliance with procedure later adopted in *Goodchild*. While we have disapproved of the practice of permitting the jury to pass on the voluntariness of the confession, we pointed out in *Phillips v. State* (1966), 29 Wis. 2d 521, 531, 139 N. W. 2d 41, that:

"The trial court followed the Massachusetts rule not knowing which procedure this court would adopt. Any error in submitting the question of voluntariness to the

jury under the Massachusetts rule was not prejudicial since the court had found the confession to be voluntary."

We conclude the same rationale to be applicable here. We find no error on the basis of the failure to conform exactly with *Goodchild;* rather, the court's conclusion that the confessions were voluntary must be tested in the light of the substance of *Goodchild, i.e.,* whether the state successfully carried its "burden of proving voluntariness beyond a reasonable doubt." *Supra,* page 264.

We said in *State v. Carter* (1966), 33 Wis. 2d 80, 88, 146 N. W. 2d 466:

"The only question at the hearing was that of the voluntariness of the defendant's confession under the 'totality of the circumstances' test. Thus the state had the burden to prove beyond a reasonable doubt that the confession was a result of deliberateness of choice and that it was the product of a free and unconstrained will."

In the recent case of *Greenwald v. State* (1967), 35 Wis. 2d 146, 150, 150 N. W. 2d 507, we reiterated the standards set forth in *Carter, supra,* pages 89–91, to be used by this court in reviewing a trial court's determination of voluntariness. We said:

" 'While this court unquestionably has the power to review the evidentiary facts *de novo* where constitutional principles are involved, it does not follow that we must do so, especially when it appears adequate procedures have been adopted by the trial court. . . .

" 'Where the court has made detailed findings of fact . . . our review of the evidentiary or historical physical facts will be limited to the same review that is used in other factual disputes heard and determined by a trial judge. The findings of the trial court will not be upset unless they are against the great weight and clear preponderance of the evidence.' "

Although the trial court's findings herein lack the specificity that the *Goodchild* procedure aims to achieve, nevertheless, it should be borne in mind that this case

antedates the directions set forth in *Goodchild.* As so viewed, we conclude that the trial court's procedure was highly commendable and attained in substance the objectives that *Goodchild* strives for. Because in this case the evidence is not in dispute and the testimony of the defendant and of the police officers are in almost complete agreement, on the basis of the record we come to the conclusion that the trial court's decision that the confessions were "free and deliberate acts of the defendant" is not contrary to the great weight and clear preponderance of the evidence.

A review of the events from the time that Sherry was taken to the Safety Building to the time she gave her confession clearly shows that her confession was voluntary and not the result of overbearing pressures that deprived her of the right to the deliberate exercise of unconstrained free will.

The hearing on voluntariness revealed that Sherry was just eighteen. She was the mother of three children, only one of whom she claimed to be the child of her husband. She had received the equivalent of a ninth grade education. The last time she attended school was as an inmate of the School for Girls at Oregon, Wisconsin. Her husband had left the apartment a few days before, and Sherry was distraught and had walked the streets looking for him. On the night of the murders, she had been out of the apartment looking for him. She had no food for several days. She claimed, and it was not disputed, that she had been unable to eat and had not eaten for three or four days prior to her confession. At the time she was questioned at her apartment shortly after 2 a. m. she appeared very excited. At this time she told the police that at about 1:45 she left the apartment to visit her mother, who lived across the street. Being unable to arouse her mother, she returned home and claimed that, as she entered her apartment, she saw a man, who she initially said was her husband, run from the rear of the flat. She claimed that she then returned

to the flat and realized there was something wrong with the children. She called a neighbor, who, in turn, called an ambulance. With the exception of the fact that she later stated that the man she saw was not her husband, she stuck with this story until giving the confessions that are the subject of this inquiry.

At about 3 a. m. she was brought to the Safety Building and was interrogated at 4 a. m. for about fifteen minutes. It is not clear from the statements of either Sherry or the police just what happened between 4 a. m. and 7:30 a. m., the time of the visit to the morgue. The police officers' testimony refers to no interrogation during that period. Yet it is clear that a police officer was with Sherry at all times. Sherry, however, in her direct testimony stated that there were substantial periods when she was not asked any questions.

At approximately 7:30 a. m. she was taken to the morgue to see the bodies of her two strangled children. She stayed with them for approximately thirty-five minutes. At 9 a. m. she was interrogated by two police officers. She states that they "talked real nice" and "gave [her a] handkerchief" and, upon learning that she had a headache, gave her aspirin and water. She was also asked if she wanted to rest or to have food. She declined the offers of food and rest. She testified that the interrogation was persistent and that the officers repeatedly said, "We know you did it." She was shown a statement signed by her father (the authenticity of this document has not been disputed) saying that he believed she did it.

It is also undisputed that near the start of questioning which began at 9 a. m. the officers told her that she need not answer any of the questions put to her. She was asked if she wished to see her mother, but she declined to see her. She was asked if she wished to see her husband. She said she would "love to." The police also asked her if she wanted an attorney, but Sherry stated that she

would let them know about that after she saw her husband. During the course of questioning Sherry asked for a change of clothes and the police department secured a dress she wanted from her apartment. At 10 or 10:30 her minister was called. He arrived at about 10:45 and stayed with her for approximately an hour, praying with Sherry and discussing her problems with her. A police officer was present during this conversation. At approximately 11:10–11:15 Sherry's husband arrived, and he talked with her for fifteen or twenty minutes. His visit was interrupted by some further police questioning, but he talked to her for a second time at about noon. Though the detectives on several occasions offered her food and a chance to rest, Sherry refused these offers, although she did take water and aspirin. No claim is made that any force or threat of force was used. The claim is that, under the circumstances, the repetitive questioning and the statement of the police, "We know you did it," resulted in the overbearing of her will and induced an involuntary confession. Until some time after noon, Sherry told a consistent story and denied the strangulation of her children.

At approximately 12:30 p. m. the detectives went to lunch and left Sherry at the booking desk for the noon hour. Sherry claims that the booking clerk kept repeating over and over, "You did it. You strangled your kids, you did it with a cord." It was at this point Sherry said, "Yea, I did it." Sherry was then taken to the jail. Detectives Jones and Brown were then called, and they resumed questioning at approximately 2 p. m. At the outset of the afternoon session she denied killing her children. However, after about ten minutes of questioning, she admitted their murders. Prior to taking the confession Sherry was asked how she felt, and she said she felt better. She was at this time advised of her rights against self-incrimination. Before a written state-

ment was taken she was asked whether she wanted counsel. The police officers testified that at this time Sherry seemed clear of mind, was not confused, was alert and lucid, and gave no evidence of any physical ailment.

By approximately 3:25 in the afternoon Sherry had completed writing a narrative statement confessing to the strangulation of her children with an electric extension cord, and had also given substantially the same information to a court reporter in response to police interrogation.

It was on the basis of the above chronology that the trial court found the confessions admissible as "the free and deliberate acts of the defendant."

We agree with that conclusion. The police procedures used herein were in the main commendable. The defendant was offered opportunity for rest and food and needed medication for her headache. She was given an opportunity to see her mother, though she did not wish to, her husband, and her minister. There were substantial periods when she was not interrogated at all. She was brought a change of clothes. She was asked if she wanted counsel, and was advised of her right to remain silent. There was no threat at any time of force. While she claims that she was promised treatment as a mental patient if she would confess, this was denied by the officers; and the judge specifically found that no promises had been made to induce the confession.

We cannot, however, condone the conduct of the police in taking this girl of eighteen to the morgue to view her strangled babies. Counsel, during oral argument, found it impossible to defend this reprehensible conduct. The visit had no legitimate police purpose. There was no question of identification that might have required the mother to see these children. Sherry testified:

". . . before they took me down there to the Morgue, I heard the detectives outside the door say that if they

take me down to the Morgue and let her see the kids, she will probably break down and say she did it."

She stated that when they took her to the morgue they "showed me my kids and they started talking about see what you did to your kids." She stated that she broke down and was unable to walk out of the morgue and had to be carried. One of the police officers stated:

"I took the defendant to the County Morgue to view the bodies of her children . . . . and when she saw the two bodies, she started crying and she hugged both of them and attempted to lay on the cart where the children were. We stayed down there approximately 35 minutes and during this time she continued crying and kept on saying, 'My babies, my babies, my babies.'"

Had this crude attempt to overbear the will of this defendant resulted in a confession, we would without hesitancy declare the confession coerced and involuntary. As the United States Supreme Court has said:

". . . coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'" *Blackburn v. Alabama* (1960), 361 U. S. 199, 206, 80 Sup. Ct. 274, 4 L. Ed. 2d 242.

We conclude, however, that this morbid bit of police work did not wring the confession from the defendant. This incident was far enough removed from the time of the final confession that it did not contaminate the otherwise commendable efforts of the detective bureau, to the extent that we are now obliged to hold the confession inadmissible.

The fact is that, despite the harrowing experience of being taken to the morgue and remaining there for thirty-five minutes with the dead bodies, Sherry did not confess. This ghoulish incident occurred at approxi-

mately 7:30 a. m. The confession was finally made at approximately 2 p. m. In that interval she had some respite from interrogation, and had the opportunity to see her husband and her minister. As viewed in the totality of the circumstances, this episode is not sufficient to contaminate the confession.

While Sherry was young, only a little over eighteen, police procedures were not new to her. She displayed a sophisticated knowledge of the ways of the police. She makes no claim that she did not know her constitutional rights. Her claim is that everyone blamed her for the murders and, after having this drummed into her for almost twelve hours, she confessed because she at that time blamed herself—and felt guilty—because she had left the children alone in the apartment.

We, however, do not find present those factors of force or psychological coercion that would be likely to induce an involuntary confession. Admittedly, Sherry had gone without food and sleep for some time prior to the commencement of the interrogation. There is no evidence that lack of sleep or food so affected the defendant that she was unable to make rational responses to questions posed by the police, and there is evidence to show that the police offered to permit her to eat and rest. We cannot conclude that her physical condition of hunger and fatigue that existed prior to her interrogation and which the police department was willing to alleviate can now be used to exclude the confessions.

The findings of the court are not contrary to the great weight and clear preponderance of the evidence, and are supported without substantial contradiction by the defendant's own testimony. We conclude, after a review of the constitutionally relevant facts that the confessions were a product of the free and unconstrained will of the defendant, that they were voluntarily given, and were properly admitted into evidence.

*Applicability of Escobedo and Miranda.*

The language used by this court in *Ray v. State* (1967), 33 Wis. 2d 685, 687, 148 N. W. 2d 31, disposes of the defendant's contentions that both *Miranda* and *Escobedo* should be applicable. We said therein:

"*Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. (2d) 694, contrary to defendant's assertion, is not applicable, since it applies only to cases commenced after June 13, 1966. The defendant would also invoke the protection of *Escobedo v. Illinois* (1964), 378 U. S. 478, 84 Sup. Ct. 1758, 12 L. Ed. (2d) 977. We have, however, repeatedly stated that *Escobedo* is inapplicable unless the prisoner has requested counsel and that request has been denied. *Simpson v. State* (1966), 32 Wis. (2d) 195, 203, 145 N. W. (2d) 206; *Neuenfeldt v. State* (1965), 29 Wis. (2d) 20, 138 N. W. (2d) 252; *State v. Burnett* (1966), 30 Wis. (2d) 375, 141 N. W. (2d) 221; *Phillips v. State* (1966), 29 Wis. (2d) 521, 139 N. W. (2d) 41; *State ex rel. Goodchild v. Burke* (1965), 27 Wis. (2d) 244, 133 N. W. (2d) 753. We have recently said in *Holloway v. State* (1966), 32 Wis. (2d) 559, 146 N. W. (2d) 441, that our prior interpretations of *Escobedo,* limiting its applicability to its very facts, have not been altered by the subsequent decision in *Miranda.*"

*Should a guardian ad litem have been appointed for the defendant to appear for her prior to and during the course of the trial?*

This question was raised for the first time in the briefs that are before us on this appeal. We have frequently said that even the claim of a constitutional right will be deemed waived unless timely raised in the trial court. *Cordes v. Hoffman* (1963), 19 Wis. 2d 236, 120 N. W. 2d 137; *Goyer v. State* (1965), 26 Wis. 2d 244, 131 N. W. 2d 888; *Rafferty v. State* (1966), 29 Wis. 2d 470, 138 N. W. 2d 741. We have, however, concluded that this court may nevertheless decide a constitutional question not raised below if it appears in the interests of justice

to do so and where there are no factual issues that need resolution. There are none which would preclude us from considering the defendant's claimed right to have a guardian *ad litem*. However, under the facts of this case we fail to see that a meritorious argument has been presented. The defendant relies primarily upon the recent United States Supreme Court case of *In re Gault, supra*. That case in essence held that a juvenile who is charged with conduct that in respect to an adult would be considered criminal is entitled to at least some of the constitutional protections afforded an adult in a criminal case. It specifically held that a juvenile must be advised of his right to counsel and of his right to remain silent. The *Gault Case* has no relevancy to the one presently before this court. Sherry Bradley was not prosecuted under ch. 48, Stats., the Children's Code. She was prosecuted as an adult under the Criminal Code and was afforded the proper constitutional protection. Counsel for the defendant argues principally that a guardian *ad litem* is required by the principles of *Gault* because of the possibilities that a confession of a juvenile may be the product of coercion.

We have concluded that Sherry's confession was deliberate and uncoerced. Moreover, a guardian *ad litem* could offer no more protection to a defendant than could the timely appointment of other counsel. Although Sherry was informed of her right to counsel, she did not ask for one.

There is no requirement that a guardian *ad litem* be appointed in these circumstances, nor has counsel called our attention to any authority which would authorize such an appointment. We conclude that defendant's argument in this respect is also without merit.

*By the Court.*—Judgment affirmed.

PER CURIAM (*on rehearing*). The plaintiff in error in her brief for rehearing argues that this court erred: (1) In concluding the confessions were freely and voluntarily

made, and (2) in applying on appeal the great-weight-and-clear-preponderance-of-the-evidence test rather than the beyond-a-reasonable-doubt test. This court rested its decision of voluntariness on two grounds. First, the court made an independent investigation of the facts underlying the issue of voluntariness and concluded the confessions were voluntarily made beyond a reasonable doubt. In this procedure, this court itself was required to be and was convinced beyond a reasonable doubt of the voluntariness of the confessions.

It is true, we stated also in the opinion the trial court's finding was not against the great weight and clear preponderance of the evidence. But, in view of our independent determination this statement, although true, is immaterial. Whether the proper test on review of a trial court's finding of voluntariness when this court does not make an independent investigation of the facts should be stated in terms of the great-weight-and-clear-preponderance-of-the-evidence test or in terms of whether this court can say that the trial court could have been convinced beyond a reasonable doubt or that no finder of fact could be so convinced, we reserve for future consideration. Rehearing denied.