STATE, Respondent, v. HARRELL, Appellant.

*No. State 15.  Argued October 4, 1968.—Decided November 26, 1968.*
(Also reported in 162 N. W. 2d 590.)

538

540

For the appellant there was a brief and oral argument by *Daniel J. Weiss* of Milwaukee.

For the respondent the cause was argued by *Harold B. Jackson, Jr.,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *David J. Cannon,* district attorney.

HEFFERNAN, J.

*Was the statement following the morgue visit admissible*

The evidence indicated that the defendant was brought to the Safety Building at approximately 2:45 in the morning of July 4th. He was advised of his constitutional right to counsel and his right to remain silent.

Shortly thereafter he was taken to the morgue to view the body of his wife. He was in the morgue for less than five minutes. He was then brought back to the consultation room, and he forthwith made a statement that denied any knowledge of, or connection with, the shooting of his wife. The statement given at that time appears in the following excerpt of the trial transcript:

". . . he said 'I left my house on July the 3rd about 10:00 A. M., that morning. I went to a tavern on West Vliet Street, had a few drinks. I then went to a friends' house on North 15th Street. I stayed there at this home during all the day and when I left this house, my friends' house, I went home and it was dark at this time.' He didn't know what time it was, he said, 'It was dark.'

"And when he got to his home at 1810 West McKinley he saw or met his mother and sister, or sister-in-law, and his niece on the front porch. He talked to them for several minutes.

"He then walked around to the rear of the house at 1810 W. McKinley, where he had his car parked. He got into his car, in the front seat, and fell asleep, and he didn't know anything else until after the police woke him up."

The trial court found that the statement quoted above was voluntary and that:

". . . none of the responses he made or statements he made were induced by any promises or threats or force or duress of any kind, either physical or psychological; that the statements and his responses were, from the totality of all the circumstances, applying 14th Amendment due process standards, were his deliberate choice; that he made them understandingly, with full knowledge of his rights to remain silent and to have an attorney and that, factually from the evidence adduced, the Court is satisfied beyond a reasonable doubt that there were no circumstances which indicated any Constitutional contamination or any involuntariness involved in any of the statements . . . and that any and all of such statements were the deliberate, free choice of the defendant."

The court therefore concluded, after holding a hearing out of the presence of the jury and following a procedure

substantially in conformance with *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753, that the statements properly were admissible into evidence.

As we have stated in *State v. Carter* (1966), 33 Wis. 2d 80, 90, 91, 146 N. W. 2d 466, these findings and conclusions will not be upset unless they are contrary to the great weight and clear preponderance of the evidence. The trial court's decision, however, antedated the admonitions of this court in *Bradley v. State* (1967), 36 Wis. 2d 345, 153 N. W. 2d 38, 155 N. W. 2d 564, wherein we characterized the practice of morgue viewing as "reprehensible" when there was no clear evidence that such a viewing by an accused was necessary to make an identification of the deceased. It also preceded the adoption in *McKinley v. State* (1967), 37 Wis. 2d 26, 154 N. W. 2d 344, of an exclusionary rule barring the use of a confession made by an accused within a short time after being taken to the morgue to view the corpse of a person he was suspected of having murdered. In the instant case the statement of the defendant was given to the police officers within a few minutes after his return from the morgue. The record indicates that he was taken to the morgue at 3:05 a. m. and, between that time and 3:45, when interrogation ceased, the visit to the morgue was made and the statement taken. Were this a confession, we would be compelled to find that the circumstances under which the statement was taken falls squarely within the proscription of the *McKinley Case*. In *McKinley* we stated:

"In situations such as we have here, where a confession is made within an hour and one half or an hour and forty minutes after the police have taken the accused into the morgue to view the body of the deceased, the issue of the voluntariness of a confession should not be permitted to turn on a finding of the trial judge that such morgue viewing had no psychological effect in inducing the questioned confession. Rather, we deem that where the confession follows the morgue viewing as

closely in time as occurred here it should be held as a matter of law that the confession is the result of such psychological pressure as to render the same involuntary."

In the instant case, however, the *McKinley* rule is not applicable. It applies only to confessions, and, as a consequence, the exculpatory statement is not barred by the exclusionary rule adopted by this court. In this respect the *McKinley* rule differs from the rule of *Miranda*, which excludes all statements given in violation of the standards therein, whether the statements are exculpatory or inculpatory. *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

If the statement is involuntary it is, of course, inadmissible. The only question, therefore, is whether the court's finding that the statement was voluntary is contrary to the great weight and clear preponderance of the evidence. The trial court determined that Harrell was advised at length of his right to remain silent. He was warned that any statements given could be used against him, that he had the right to have his attorney present during the questioning, and that if he were indigent such attorney would be compensated by the state. He also was advised that in the event he waived his right to be silent and commenced to give a statement that he could at any time refuse to give further information and insist upon the presence of an attorney. It is uncontradicted that all of these precautionary warnings were given, and there is no evidence whatsoever that the defendant was left ignorant of his constitutional rights. Moreover, immediately after the giving of his initial statement he asked for an attorney, and the attorney was promptly called by the police. The fact that he requested counsel at this point is indicative of the fact that he was not so intoxicated as to not understand the warnings that had been given him and tends to prove that he intelligently waived his rights. Moreover, there was evidence, despite

the fact that he smelled of alcohol, that he was alert and not "groggy." The visit to the morgue was most perfunctory, and the entire time that elapsed between taking him to the morgue and returning him to the interrogation room was less than five minutes. There was no evidence that the morgue visit in any way impelled him to give the exculpatory statement that the defendant objects to. The record is devoid of a showing of any practices that would tend to overbear the free will of the defendant. In view of these circumstances, which are uncontradicted, the finding of the trial court that the statement was voluntary is not contrary to the great weight and clear preponderance of the evidence.

The mere fact that the statement by its inconsistency with the later statement affected the credibility of the defendant does not thereby place it within the ambit of the *McKinley* exclusionary rule. Although it proved to be an inculpatory statement when viewed in the setting of the trial, because it cast doubt upon the witness' credibility, it was not a confession subject to the rule of *McKinley*. It must be treated as an ordinary statement; and since it was voluntary, as viewed in the totality of the circumstances, it was properly admissible.

*Was the evidence sufficient for the jury to find the defendant guilty beyond a reasonable doubt*

The question on review is whether the evidence adduced, believed, and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *Payne v. State* (1967), 36 Wis. 2d 307, 310, 152 N. W. 2d 903; *Lock v. State* (1966), 31 Wis. 2d 110, 114, 142 N. W. 2d 183; *State v. Johnson* (1960), 11 Wis. 2d 130, 137, 104 N. W. 2d 379. However, it is not this court that is to be convinced that the defendant was guilty beyond a reasonable doubt. That determination is to be made by the jury, and our determination is mere-

ly whether a jury acting reasonably could have been so convinced. We stated in *Lock v. State, supra,* page 114:

"Invariably the briefs and arguments on this issue point to what the trier of the facts could have found or what this court should determine. The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of the facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true."

Thus, viewing the evidence of record, was the evidence sufficient to find Acklee Harrell guilty beyond a reasonable doubt of the murder of his wife Mary?

The facts of this case must be established in part by circumstantial evidence. No one other than the alleged murderer was in a position to say what happened at and just prior to the time that Mary Harrell was shot. Acklee Harrell gave two statements, and they are conflicting in all important respects.

The first statement given shortly after his being taken into custody denied any knowledge of the crime, and he stated that he had not gone to the apartment at all after his return from a tavern but went to sleep in his parked car.

The second statement, given after conferring with counsel, and which was reiterated by Harrell at trial, recounts Harrell's assertion that he entered the apartment at approximately 8 p. m., that he was so drunk that he was unable to unlock the door, and that he was assisted by his sister. He testified that, after he entered the apartment, he went to sleep and sometime later he observed his wife standing over him with a butcher knife, and she stated, "I'm going to kill you." He attempted to defend himself and a scuffle developed. He said he was able to knock the knife from her hand and kicked it under a sofa. His wife then ran into an adjoining bedroom and returned with his revolver, which

he kept on a shelf in the bedroom. He tried to take the gun away from her, and the ensuing scuffle took them from the bedroom, through the kitchen, and into the bathroom. He stated that, while he was trying to get the gun from her, the gun went off and she fell to the bathroom floor. He said that he was frightened and that he took the gun and threw it under the front porch. He then told his sister, who was sitting on the front porch, his wife was "sick." He testified that he then went to a tavern, where he drank until approximately midnight, and that he then returned and fell asleep in his automobile at the rear of his home.

In addition to the voluntary statements given by the accused to the police and his testimony at trial, the jury had before it the testimony of the medical examiner and of the police officers who investigated the shooting in the Harrell apartment. The deceased was described as lying on her left side, partially behind the toilet bowl, against the bathroom wall. Her dress was pulled up and her underpants were rolled down between her knees and her hips. At the time of the initial investigation the police officer observed what appeared to be urine in the toilet bowl. The medical examiner stated that the deceased's bladder was empty and this, he said, was consistent with her just having voided her bladder. Contrary to the assertion of the defendant that he had kicked the butcher knife under the sofa, the butcher knife was found on the top of the toilet tank. There were powder marks on the defendant's hands, but none on the clothing of the deceased. Expert opinion was introduced which concluded that, therefore, the shot was fired at a distance more than 18 inches from the person of Mary Harrell. This, of course, is inconsistent with Acklee Harrell's assertion that the gun went off while the parties were in close contact and scuffling. It was undisputed that the bullet which killed Mary Harrell was fired by the gun which Acklee Harrell admitted was his.

There was evidence that the defendant and his wife had frequent arguments in the past and that the police had been called in to settle their disputes. One police officer testified that on an earlier occasion when he arrived at the Harrell apartment he saw the defendant's wife on the floor with the defendant's hands around her throat. The officers separated the pair, but when they released their grip on Harrell, he again assaulted his wife, grabbed her by the throat, and yelled that he was going to kill her.

There was also evidence that the two had been in an altercation on the morning of the day of the death. There is no contention that any third party was in any way involved in the death of Mary Harrell, and, from the evidence, the jury could reasonably find that the defendant killed his wife and intended to do so. The position of Mary on the bathroom floor, together with the concomitant facts that she had just urinated and that there were no powder burns on the clothing, could lead the jury to reasonably conclude that Acklee Harrell's story was false. The evidence was consistent with a conclusion that she had been shot by Acklee from some distance while she was sitting on the toilet.

Essentially, Acklee Harrell's defense, in light of the circumstantial evidence pointing the finger of guilt toward him, was dependent upon the jury's belief in his credibility. However, Acklee Harrell gave inconsistent statements. His first statement, which was properly admissible into evidence, would have led the jury to believe that he knew nothing of the incident, while the second statement, at trial, contradicted the first statement and was introduced for the purpose of having the jury believe that he acted in self defense and that the shot itself was fired by accident. His trial testimony also differed from the first statement given to the police. It is universally recognized that when a witness gives in-

consistent statements his credibility is, as a consequence, impaired. It is apparent that one of the statements must have been false. The trial judge properly recognized this when he gave the *falsus in uno* instruction, which permitted the jury to disbelieve any of the testimony of a witness who has testified falsely about any material fact. The jury under these circumstances had every right to disbelieve the explanations of Acklee Harrell. The circumstances of the occurrence could reasonably lead them to conclude that Harrell's statements were false and that he shot his wife with the intent to kill her. Considering all of the facts of record, the trial judge properly denied the motion for a new trial, and the judgment must be affirmed.

### *Inadequacy of statement of facts*

In *Welsher v. State* (1965), 28 Wis. 2d 160, 170, 135 N. W. 2d 849, we said:

"*The statement of facts.* Sec. (Rule) 251.44, Stats., permits the parties in a criminal case to stipulate to dispense with an appendix. This saves printing expense for a defendant appellant who pays his own expenses, and for the state if the defendant appellant is indigent. We must point out, however, that unless the statement of facts is prepared in sufficient detail to serve as a reasonably helpful summary of or guide to the transcript of testimony, our burden is very considerably increased. For example the present record has 1,939 pages, 1,500 of which constitute the transcript of the trial, yet the statement of facts is most meager in both briefs, and it has been necessary to assemble many of the facts summarized in this opinion directly from the record."

In the instant case the record was considerably shorter than that in *Welsher*. Nevertheless, it amounted to almost 400 pages. The factual statements in both briefs were grossly inadequate and the briefs proper failed to

tie facts set forth therein with the relevant portions of the record. We consider this particularly deplorable in a case of first-degree murder, where meticulous exposition of the facts should be made by both sides. In order to make criminal appeals inexpensive we have permitted the omission of an appendix, but in no case should the appendix be omitted if the factual situation is such that a fair presentation cannot be made in a brief statement of facts.

*By the Court.*—The judgment of conviction and the order denying a new trial are affirmed.

ROBERT W. HANSEN, J. (*concurring*). I agree with the route traveled and result reached in the court's opinion in this case, but add this concurring footnote to comment that if I had been on the court at the time of the *McKinley Case,*[1] I would have sought a far sharper differentiation between "psychological coercion" and "psychological pressure." Coercion, properly defined, describes a force that coerces or compels. Pressure, broadly defined, includes any influence that persuades or impels. The distinction between the two ought not be blurred if the test is to be the voluntariness of admissions made. It is not a police responsibility to protect or insulate a guilty person from every prompting of his own conscience.

[1] *McKinley v. State* (1967), 37 Wis. 2d 26, 154 N. W. 2d 344.